# EXHIBIT A

EFiled:  Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

# IN THE SUPERIOR COURT
## OF THE STATE OF DELAWARE

DENNIS KIRLIN,     )
         )
    Plaintiff,   )
         )  C.A. No. _____
  v.        )
         )  JURY TRIAL DEMANDED
         )
         )
         )
CITY OF WILMINGTON   )
         )
    Defendant.  )

## COMPLAINT

## INTRODUCTION

1. Plaintiff, Dennis Kirlin ("Plaintiff") files this action against Defendant, the City of Wilmington ("Defendant") for compensatory damages, punitive damages and attorneys' fees for violations of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000(e) *et seq.)* ("Title VII") and the Delaware Discrimination in Employment Act 19 *Del. C.* § 710, *et seq*., ("DDEA").

## NATURE OF THE ACTION

2. Defendant City of Wilmington employed Plaintiff for 45 years. Plaintiff began his employment with Defendant on July 5, 1978, in the position of Firefighter.

3.    Plaintiff was promoted several times throughout his tenure at Defendant. Most recently, he was promoted to the rank of Battalion Chief on July of 2011.

4.    Defendant City of Wilmington wrongfully and retaliatorily intentionally caused Plaintiff's benefits and accrued sick and vacation time to be diminished in violation of Title VII and the DDEA following his engagement in protected activity.

5.    Defendant further breached the implied covenant of good faith and fair dealing which, under Delaware law, inheres in every contract.

## JURISDICTION

6.    This Court has jurisdiction over this matter pursuant to 10 *Del. C.* §§ 541, 542 and 19 *Del. C.* § 714.

## PARTIES

7.    Plaintiff is a resident of New Castle County, Delaware, who at all times relevant to this Complaint was an employee of Defendant City of Wilmington.

8.    Defendant City of Wilmington is a municipal government existing under the laws of the State of Delaware pursuant to 40 Del. Laws, Chapter 179, as amended by 46 Del. Laws, Chapter 236, within the Wilmington City Code Art. I, § I-100.

## ADMINISTRATIVE PROCESS

2

9.   On November 7, 2024, Plaintiff filed a timely Charge of Discrimination with the Delaware Department of Labor ("DDOL") alleging discrimination and retaliation against Defendant City of Wilmington.

10. On August 25, 2025, Plaintiff received a "Final Determination and Right to Sue Notice" from the DDOL, attached hereto as *Exhibit A.*

11.On September 16, 2025, Plaintiff received a "Final Determination and Right to Sue Notice" from the EEOC, attached hereto as *Exhibit B*.

12.Plaintiff has filed this action within ninety (90) days after receipt of his Federal Right to Sue (Case No.: KIR110724 / 17C-2025-00109).

13. Plaintiff has satisfied all statutory prerequisites for filing this action.

## **FACTS**

14.   Plaintiff began his employment with Defendant on July 5, 1978.

15.   Plaintiff has received high employment evaluations and countless commendations throughout his 45-year tenure with Defendant City of Wilmington.

16.   On or around December 9, 2020, Plaintiff participated as a witness for an employee of Defendant ("the Employee") in a Trial Board Hearing related to discipline of the Employee, which was alleged to have been discriminatorily issued.

17.   The disciplined employee filed multiple charges of discrimination with the Delaware Department of Labor and Equal Employment Commission and ultimately filed a Complaint of discrimination in Federal Court on June 14, 2022.

18.     Thereafter, on or around April 7, 2023, Plaintiff was responding to a call when he was severely injured in an on-duty motor vehicle accident. By way of explanation, Plaintiff sustained a traumatic brain injury ("TBI") when his SUV was T-boned forcefully on the passenger side rear.

19.     On or around September 12, 2023, Plaintiff's doctor advised Defendant that upon examination Plaintiff was not cleared to return to work at that time due to his severe injuries sustained in the aforestated on-duty motor vehicle accident. Plaintiff's doctor further stated Plaintiff's ability to return to work would be reassessed in six months.

20.     Before the end of the six-month period and Plaintiff's doctor's reassessment, on or around January 2, 2024, Defendant's Medical Provider determined Plaintiff was incapacitated from performing full firefighting duties for the reasonably foreseeable future.

21.     Thereafter, on or around January 11, 2024, Chief John Looney wrote to Plaintiff informing him that he was medically separated from Defendant. Chief Looney informed Plaintiff his termination would be effective January 12, 2024.

22.     On or around January 12, 2024, Chief Looney recommended to Defendant Human Resource Director, Charlotte Barnes, that Plaintiff's benefits be continued in accordance with Human Resources Policy 402.1, concerning Public Safety Officers Health Benefits, ("Hot Pursuit Benefits").

4

23.    Due to Plaintiff's serious health conditions that required immediate and continuous treatment, Plaintiff needed confirmation that he would be approved for continued benefits in accordance with Human Resources Policy 402.1, concerning Public Safety Officers Health Benefits at the time of his medical separation.

24.    Without confirmation of benefits Plaintiff was unable to retire and was forced to use his accrued sick and vacation time, which he would have otherwise been paid out for.

25.    As such, Plaintiff was forced to elect terminal leave, utilizing his unused sick and vacation time.

26.    During this time, Plaintiff continually followed up with Defendant regarding his "Hot Pursuit" retirement benefits in accordance with Human Resources Policy 402.1.

27.    On January 11, 2024, the Chief did not advise Plaintiff of his eligibility for benefits under Human Resources Policy 402.1.

28.    Pursuant to the Collective Bargaining Agreement ("CBA"), attached hereto as *Exhibit C*, between the International Association of Fire Fighters and Defendant, which governed Plaintiff's employment, Plaintiff was properly entitled to lump sum payment for his accrued sick time at the time of his retirement.

29.    Section 7.13 of the CBA states:

(1) . . . (2) Effective January 1, 2006, an employee who, upon retirement, has accumulated at least 200 or more days of unused sick

5

leave, shall be granted the right to retire from active duty by fifty percent (50%) of the unused sick leave working days earlier than the employee's normal effective date of retirement. (3) Payment under this Section shall be made in a lump sum on the next regular pay date after retirement

30.    Based on this provision, Plaintiff was properly entitled to retire on January 12, 2024, with the benefits stipulated by Defendant's Human Resources Policy 402.1.

31.    Defendant's Human Resources Policy 402.1 states Defendant "shall provide the same level of health insurance benefits to a public safety officer who retires or is separated from services as a direct or proximate result of a personal injury sustained in the line of duty while responding to a hot pursuit or emergency situation, as the officer had when the incident occurred."

32.    Furthermore, pursuant to Defendant's policy, Plaintiff should have received a lump sum payment equivalent to fifty percent (50%) of his unused sick leave working days calculated based on a retirement date earlier than his normal effective date.

33.    On or around September 19, 2024, Plaintiff contacted Chief Looney regarding his pension and "Hot Pursuit" benefits. Chief Looney sent Plaintiff's request to Director Barnes. Director Barnes failed to respond.

34.    On or around October 10, 2024, Plaintiff emailed Director of Benefits Victoria Roth regarding his "Hot Pursuit" benefits. Ms. Roth failed to respond.

35.    Upon information and belief, Defendant has allowed other firefighters who did not engage in protected activity to utilize "Hot Pursuit" benefits instead of their own sick leave.

36.    By way of example, during this time period and without delay, upon information and belief, Defendant and Director Barnes issued "Hot Pursuit" benefits to Manny Gonzales, who did not engage in protected activity.

37.    Moreover, during this time period and without delay, upon information and belief, Defendant and Director Barnes issued "Hot Pursuit" benefits to Gary Nichevo, who did not engage in protected activity.

38.    Plaintiff was not provided "Hot Pursuit" benefit continuation, leading to loss lump sum payment of his accrued sick time in order to maintain insurance coverage during recovery..

39.    Further, Plaintiff was eligible for a full pension on January 12, 2024, and therefore, he should have received his full salary in conjunction with this lump sum payment for his accrued sick time.

40.    Believing there was an error in the information provided to Plaintiff, Union President Robinson followed up on the Chief's recommendation for benefits pursuant to Human Resources Policy 402.1 numerous times between July and September of 2024.

41.    President Robinson was ultimately compelled to contact Defendant Chief of Staff and Mayor Purzycki.

42.    Upon information and belief, Director Barnes did not respond to inquiries related to Plaintiff's benefit continuance until Mayor Purzycki intervened.

43.    Consequently, Plaintiff was forced to use his unused sick and vacation time from January 12, 2024, until September 18, 2024, due to Defendant's unjustified delay in granting his benefit continuance.

44.    Had Plaintiff not elected terminal leave, he could have commenced his full-service pension on January 13, 2024, and cashed out his unused sick and vacation time.

45.    During this time period, Plaintiff served as a witness for the aforementioned Employee's Title VII proceedings and discrimination lawsuit against Defendant.

46.    By way of background, counsel for Defendant contacted Plaintiff multiple times requesting he serve as a witness for Defendant against the Employee.

47.    On or around March 18, 2024, Plaintiff informed counsel for Defendant that he would not be a witness for Defendant in the litigation commenced by the Employee.

48.    Plaintiff instead informed Defendant he would be a witness for the Employee. As such, based on the Employee's claims, Plaintiff's testimony was in part against Director Barnes.

49.    In retaliation for failing to be a witness for Defendant and as Plaintiff stated to counsel against Director Barnes, Defendant intentionally delayed approving Plaintiff's "Hot Pursuit Benefits".

50.    On or around October 30, 2024, counsel for Defendant informed Plaintiff he would be subpoenaed for a deposition in the Employee's matter.

51.    Plaintiff was deposed in the Employee's matter on or around November 14, 2024.

52.    In direct retaliation for his protected activities and in violation of its own policies and procedures, Defendant and Director Barnes delayed Plaintiff's "Hot Pursuit" benefit continuation, forcing him to use his accrued sick and vacation time from January 12, 2024, until October 22, 2024, resulting in substantial loss to Plaintiff.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant:

### COUNT I
### Retaliation in Violation of the Title VII of the Civil Rights Act of 1964
### (42 U.S.C. 2000e *et al.*) and the Delaware Discrimination
### in Employment Act (19 *Del. C.* § 710, *et seq.*)

9

53.    The allegations of paragraphs 1 through 52 are incorporated by reference as if fully restated herein.

54.    Plaintiff engaged in protected activity when he served as a witness and was later deposed, in a Title VII proceeding and lawsuit for discrimination against Defendant.

55.    Pursuant to Title VII. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a)., any participation in a Title VII proceeding is protected activity.

56.    Defendant repeatedly contacted Plaintiff seeking for him to be a witness for Defendant in the above-mentioned proceeding by the Employee.

57.    Plaintiff informed Defendant he would be a witness for Employee – not Defendant.

58.    After expressing his refusal to participate in the Title VII proceeding for Defendant and engaging in protected activity, Plaintiff was denied benefits. Specifically, Defendant intentionally delayed Plaintiff's "Hot Pursuit" benefits which he was entitled to pursuant to Human Resources Policy 402.1.

59.    Defendant issued other employees who, upon information and belief, had not engaged in protected activity, their "Hot Pursuit", including Manny Gonzales and Gary Nichevo.

60.    Plaintiff suffered damages as a direct result of Defendant City of Wilmington's unlawful retaliatory actions, including emotional distress, lost wages and benefits, compensatory damages and the costs of bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

A. Declare the conduct by Defendant to be in violation of Plaintiff's statutory rights and common law rights.

B. Awarding Plaintiff any and all consequential damages, including, but not limited to lost wages, salary, employment benefits, back pay, front pay, pre and post judgement interest, equity, liquidated damages, and any or all pecuniary damages.

C. Awarding Plaintiff all compensation due as a result of Defendant's violations herein.

D. Awarding Plaintiff costs and reasonable attorney's fees.

E. Awarding Plaintiff pre and post judgment interest at the legal rate.

F. Any and all such other relief as the Court deems appropriate under the circumstances.

**ALLEN AND ASSOCIATES**

*/s/ Michele D. Allen*
Michele D. Allen (#4359)

11

4250 Lancaster Pike Suite 230
Wilmington, DE 19805
302-234-8600
302-397-3930 (fax)
michele@allenlaborlaw.com
*Attorney for Plaintiff*

Dated: December 15, 2025

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

COUNTY: **NC**   K   S                    CIVIL ACTION NUMBER:_____

| | |
|---|---|
| Caption:<br><br>DENNIS KIRLIN<br><br>                PLAINTIFFS,<br>     V.<br><br>CITY OF WILMINGTON,<br><br>                DEFENDANT.<br>_____ | Civil Case Code: <u>CMIS</u><br><br>Civil Case Type: CIVIL MISCELLANEOUS<br>_____<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION<br><br>Name and Status of Party filing document:<br><br>  DENNIS KIRLIN, Plaintiff<br><br>Document Type:(E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>  <u>COMPLAINT</u><br><br>JURY DEMAND:  YES <u> X </u>   NO _____ |
| ATTORNEY NAME(S):<br>MICHELE D. ALLEN, ESQUIRE<br>_____<br><br>ATTORNEY ID(S):<br>4359<br>_____<br><br>FIRM NAME:<br>ALLEN & ASSOCIATES<br><br>ADDRESS:<br>4250 LANCASTER PIKE, SUITE 230<br>WILMINGTON, DE 19805<br>_____<br><br>TELEPHONE NUMBER:<br>302-234-8600<br><br>FAX NUMBER:<br>302-397-3930<br><br>E-MAIL ADDRESS:<br>michele@allenlaborlaw.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>           <u>N/A</u><br>_____<br><br>_____<br>EXPLAIN THE RELATIONSHIP(S):<br><br>_____<br><br>_____<br><br>_____<br><br>_____<br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>_____<br><br>_____<br><br>_____<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 8/18

# SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS) INSTRUCTIONS

## CIVIL CASE TYPE

Please select the appropriate civil case code and case type (e.g., **CODE - AADM** and **TYPE - Administrative Agency**) from the list below.  Enter this information in the designated spaces on the Case Information Statement.

**APPEALS**
AADM - Administrative Agency
ACER -  Certiorari
ACCP -  Court of Common Pleas
AIAB -   Industrial Accident Board
APSC -  Public Service Commission
AUIB -  Unemployment Insurance Appeal Board

**COMPLAINTS**
CABT – Abatement
CASB – Asbestos
CAAA - Auto Arb Appeal
CMIS - Civil Miscellaneous
CACT - Class Action
CCON – Condemnation
CCLD – Complex Commercial Litigation Division **(NCC ONLY)**
CDBT - Debt/Breach of Contract
CDEJ - Declaratory Judgment
CDEF - Defamation
CEJM - Ejectment
CATT - Foreign & Domestic Attachment
CFJG - Foreign Judgment
CFRD - Fraud Enforcement
CINT -  Interpleader
CLEM - Lemon Law
CLIB -  Libel
CMAL - Malpractice
CMED - Medical Malpractice
CPIN -  Personal Injury
CPIA -  Personal Injury Auto
CPRL - Products Liability
CPRD - Property Damage
CRPV - Replevin
CSPD - Summary Proceedings Dispute
CCCP - Transfer from CCP
CCHA - Transfer from Chancery

**MASS TORT**
CABI – Abilify Cases
CBEN - Benzene Cases
CPEL -  Pelvic Mesh Cases
CPLX -  Plavix Cases
CPPI -  PPI Cases
CTAL - Talc Cases
CTAX - Taxotere Cases
CXAR - Xarelto Cases

**INVOLUNTARY COMMITMENTS**
INVC- Involuntary Commitment

**MISCELLANEOUS**
MAGM - AG Motion - Civil/Criminal Investigations *
MADB - Appeal from Disability Board *
MAFF -  Application for Forfeiture
MAAT -  Appointment of Attorney
MGAR -  Appointment of Guardianship
MCED -  Cease and Desist Order
MCON -  Civil Contempt/Capias
MCVP -  Civil Penalty
MSOJ -  Compel Satisfaction of Judgment
MSAM -  Compel Satisfaction of Mortgage
MCTO -  Consent Order
MIND -  Destruction of Indicia of Arrest *
MESP -   Excess Sheriff Proceeds
MHAC -  Habeas Corpus
MTOX -  Hazardous Substance Cleanup
MFOR -  Intercept of Forfeited Money
MISS -  Issuance of Subpoena
MLEX -  Lien Extension
MMAN -  Mandamus
MWIT -  Material Witness *
MWOT -  Material Witness - Out of State
MRAT -  Motion for Risk Assessment
MROP -  Petition for Return of Property
MCRO -  Petition Requesting Order
MROD -  Road Resolution
MSEL -   Sell Real Estate for Property Tax
MSEM -  Set Aside Satisfaction of Mortgage
MSSS -  Set Aside Sheriff's Sale
MSET -  Structured Settlement
MTAX -  Tax Ditches
MREF -  Tax Intercept
MLAG -  Tax Lagoons
MVAC -  Vacate Public Road
MPOS -  Writ of Possession
MPRO -  Writ of Prohibition

**MORTGAGES**
MCOM - Mortgage Commercial
MMED - Mortgage Mediation
MORT - Mortgage Non-Mediation (Res.)

**MECHANICS LIENS**
LIEN - Mechanics Lien

## * Not eFiled

## DUTY OF THE PLAINTIFF
Each plaintiff/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the complaint.

## DUTY OF THE DEFENDANT
Each defendant/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the answer and/or first responsive pleading.

Revised 08/2018

EFiled:  Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

## IN THE SUPERIOR COURT
## OF THE STATE OF DELAWARE

DENNIS KIRLIN,                          )
                                        )
       Plaintiff,                  )
                                        )     C.A. No. _____
   v.                              )
                                        )     JURY TRIAL DEMANDED
                                        )
                                        )
CITY OF WILMINGTON                      )
                                        )
       Defendant.                  )

## <u>PRAECIPE</u>

To:   **PROTHONOTARY**
      Superior Court of Delaware
      New Castle County
      Leonard L. Williams Justice Center
      500 North King Street
      Wilmington, DE 19801

      PLEASE ISSUE SUMMONS for the Sheriff of NEW CASTLE COUNTY to

serve the Complaint and Summons upon the Defendant listed below:

      City of Wilmington
      Law Department
      Louis L. Redding City/County Building
      800 French St., 9th Fl.,
      Wilmington, DE 19801

**ALLEN & ASSOCIATELS**

 /s/ *Michele D. Allen*
Michele D. Allen, Esq. (#4359)
4250 Lancaster Pike, Suite 230
Wilmington, DE 19805
Telephone: (302) 234-8600
Facsimile: (302) 397-3930
Email: michele@allenlaborlaw.com
*Attorney for Plaintiff*

Dated:  December 15, 2025

EFiled: Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

# IN THE SUPERIOR COURT
# OF THE STATE OF DELAWARE

DENNIS KIRLIN,                          )
                                        )
       Plaintiff,               )
                                        )      C.A. No. _____
    v.                             )
                                        )      JURY TRIAL DEMANDED
                                        )
                                        )
CITY OF WILMINGTON                      )
                                        )
       Defendant.              )

## <u>SUMMONS</u>

THE STATE OF DELAWARE,
TO THE SHERIFF OF NEW CASTLE COUNTY:
YOU ARE COMMANDED:

    To summon the above named defendant so that, within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon Michele D. Allen, Esquire, Plaintiff's attorney, whose address is 4250 Lancaster Pike, Suite 230, Wilmington, Delaware 19805, an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense).

    To serve upon defendant a copy hereof and of the Complaint (and of the affidavit of demand if any has been filed by plaintiff).

DATED:                                  <u>COLLEEN REDMOND</u>
                                        Prothonotary


                                        Per Deputy

TO THE ABOVE NAMED DEFENDANT:

    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorneys named above an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense),

judgment by default will be rendered against you for the relief demanded in the Complaint (or in the affidavit of demand, if any).

COLLEEN REDMOND
Prothonotary


Per Deputy

EFiled:  Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

# EXHIBIT A

**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS – OFFICE OF ANTI-DISCRIMINATION**

Dennis Kirlin                              DDOL No.: KIR110724 / 17C-2025-00109
2208 W. 11th Street
Wilmington, DE 19805

v.

CITY OF WILMINGTON - WILMINGTON FIRE DEPARTMENT
800 N FRENCH ST
WILMINGTON, DE 19801, UNITED STATES OF AMERICA

### FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

#### *No-Cause Determination and Dismissal with Corresponding Right to Sue Notice*

In this case, the Department has completed its investigation and found that there is no reasonable cause to believe that an unlawful employment practice has occurred. The Department hereby issues a No-Cause Determination and Dismissal and provides the Charging Party with a Delaware Right to Sue Notice.

This No Cause determination is based on the following facts:

*The Charging Party alleges the Respondent **Retaliation, Denial of Benefits** because of his Age and because he engaged in the EEO process, The Respondent denied the allegations of discrimination. The Department of Labor conducted an investigation and determined that the evidence did not establish reasonable cause to believe the Respondent violated the anti-discrimination laws. On August 6, 2025, we notified the Charging Party of our preliminary findings. We gave the Charging Party an opportunity to respond.*

*Charging Party submitted a response; however, the response contained no information that could have resulted in a different outcome. Therefore, we are making a finding of No Reasonable Cause.*

*This final determination is not intended to be construed as an endorsement of Respondent's actions and is not intended to impact any rights Charging Party may have under other laws.*

**See the attached Notice of Rights.**

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Office of Anti-Discrimination.

*Jason K. Atallian*

Jason K. Atallian, Administrator
Division of Industrial Affairs, Office of Anti-Discrimination

Mon Aug 25, 2025

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

17C NC Determination – RTS 20240301

**NOTICE OF DELAWARE RIGHTS**

*The Department of Labor Office of Anti-Discrimination provides the following excerpt from 19 Del. C. § 710, et seq. as information regarding the Delaware Right to Sue Notice.  If you need legal advice, please seek your own legal counsel.*

**§ 714. Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies.**

(a)      A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

(b)      The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90) days of receipt of a Federal Right to Sue Notice, whichever is later.

(c)      The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation.  A Charging Party is barred by this election of remedies from filing cases in both Superior Court and the federal forum.  If the Charging Party files in Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under this election of remedies provision.

**NOTICE OF FEDERAL RIGHTS**

1.  If your case was also filed under federal law and resulted in a "No Cause" finding, you have additional appeal rights with the Equal Employment Opportunity Commission.  Under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the DDOL's final finding.  To obtain this review, you must request it by writing to EEOC within ***15 days of your receipt*** of DDOL's final finding in your case.  Otherwise, EEOC will generally adopt the DDOL's findings.

2.  If your case was also filed under federal law, you have the right to request a federal Right to Sue Notice from the EEOC.  To obtain such a federal Right to Sue Notice, you must make a written request directly to EEOC at the address shown below.  Upon its receipt, EEOC will issue you a Notice of Right to Sue and you will have ninety (90) days to file suit.  The issuance of a Notice of Right to Sue will normally result in EEOC terminating all further processing.

Requests may be addressed to: PHLSTATEANDLOCAL@eeoc.gov or mailed to:

Equal Employment Opportunity Commission
801 Market Street
Penthouse, Suite 1000
Philadelphia, PA 19107

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

EFiled:  Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

# EXHIBIT B

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Philadelphia District Office**
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

**To:** Dennis Kirlin
2208 W. 11th Street
Wilmington, DE 19805

**Re:** Dennis Kirlin v. CITY OF WILMINGTON - WILMINGTON FIRE DEPARTMENT
EEOC Charge Number: 17C-2025-00109

EEOC Representative and email:    State Local and Tribal Program Manager
PHLSTATEANDLOCAL@EEOC.GOV

## DETERMINATION OF CHARGE

The EEOC issues the following determination: EEOC has accorded substantial weight to the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) received this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

Please retain this notice for your records.

On Behalf of the Commission:

Digitally Signed By: Karen McDonough 9/16/2025
Karen McDonough
Deputy District Director

cc:    For Respondent

Caitlyn E. Quinn
Assistant City Solicitor
City of Wilmington Law Department
800 French Street, 9th Floor
Wilmington, DE 19801

For Charging Party

Michele D. Allen, Esq.
Allen & Associates
4250 Lancaster Pike, Suite 230
Wilmington, DE 19805

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also
plan to sue claiming violations of State law, please be aware that time limits may be shorter and
other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination,
you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt
generally means the date when you (or your representative) opened this email or mail. You should
**keep a record of the date you received this notice**. Once this 90-day period has passed, your
right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an
attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of
your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in
court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This
time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the
ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under
Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your
lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.
Whether you file in Federal or State court is a matter for you to decide after talking to your
attorney. You must file a "complaint" that contains a short statement of the facts of your case
which shows that you are entitled to relief. Filing this Notice is not enough. For more information
about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals
who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or
2) a "Section 83" request. You may request your charge file under either or both procedures.
EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or
Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and
for your review.

**To make a FOIA request for your charge file**, submit your request online at
https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a
FOIA request for your charge file by U.S. Mail by submitting a signed, written request
identifying your request as a "FOIA Request" for Charge Number: 17C-2025-00109 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number: 17C-2025-00109 to the District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

EFiled:  Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

# EXHIBIT C

# WILMINGTON
# FIRE FIGHTERS ASSOCIATION



# INTERNATIONAL ASSOCIATION
# OF FIRE FIGHTERS
# LOCAL 1590
# &
# THE CITY OF WILMINGTON, DELAWARE

# COLLECTIVE BARGAINING AGREEMENT

26517170.1

**07/01/2023 – 06/30/2025**

**AGREEMENT**

**BETWEEN**

**THE CITY OF WILMINGTON, A MUNICIPAL
CORPORATION OF THE STATE OF DELAWARE
(HEREINAFTER REFERRED TO AS THE "EMPLOYER")**

**AND**

**WILMINGTON FIREFIGHTERS LOCAL 1590,
INTERNATIONAL ASSOCIATION OF FIREFIGHTERS
(HEREINAFTER REFERRED TO AS THE "UNION")**

**ARTICLE 1
PURPOSE**

**Section 1.1**    It is the purpose of this Agreement to promote and ensure harmonious relations, cooperation, and understanding between the Employer and the Employees covered hereby; to ensure true collective bargaining; and to establish proper standards of wages, working conditions, and other conditions of employment.

**ARTICLE 2
EMPLOYEES REPRESENTATIVE, DEDUCTION OF FEES
AND UNION SECURITY**

**Section 2.1**    The employer recognizes the Union as the exclusive bargaining agent for the employees certified by the Public Employment Relations Board (PERB) for the purpose of this Agreement.  The term "employees," "members" and "firefighters" shall include the ranks of Firefighter, Lieutenant, Captain, and Battalion Chief in the Fire Department of the City of Wilmington.

**Section 2.2**    Upon the written authorization of any employee covered by this contract, the City shall deduct from their wages the monthly amount of dues or voluntary agency fee as certified by the Secretary of the Union and shall deliver the same to the Treasurer of the Union.

**Section 2.3**    The Union shall deliver to the City "check-off forms" under which membership dues or voluntary agency fees are to be deducted.  Dues or fees withheld shall be

26517170.1

transmitted by the City, with a list of those for whom such deductions have been made, to the duly elected Treasurer of the Union not later than the tenth (10th) working day of the following month. Upon request, the City shall transfer all of the withheld dues and fees by direct deposit to an account designated by the Union

**Section 2.4**    The City further agrees to recognize any authorized Union official and to permit the said officials to visit the work sites of the Fire Department, to investigate working conditions, adjust grievances or disputes, conduct normal Union business or to implement any other matters relating to the terms and conditions of this contract, but this activity shall be conducted so that it does not impair the operations or the manpower availability of the Department.

**Section 2.5    UNION SECURITY CLAUSES**

(a)    All Firefighters in the bargaining unit who were members of Wilmington Firefighters Local 1590 as of June 1, 1972, or who have become members since that date, shall during the course of their employment have the right to maintain their membership in Local 1590.

(b)    All new employees of the Fire Department may become members of Wilmington Firefighters Local 1590 upon successful completion of their probationary period.

**Section 2.6**    The Union agrees that they shall hold the employer harmless against any and all complaints, claims, judgments, or demands that may arise out of or in any way be related to compliance by the employer with the terms of this Article or in reliance by the employer upon any document furnished to the employer by the Union pursuant to the provisions of this Article.

### ARTICLE 3
### DEFINITIONS

The following words, terms and phrases, when used in this contract, shall have the meaning ascribed to them in this article, except where the context clearly indicates a different meaning.

Employee – is defined as an individual who is (a) assigned to a position on the position allocation list; (b) is compensated on a 40 hour work week which constitutes a full remuneration of all services rendered regardless of the number of hours worked; (c) has completed a probationary period and (d) occupies a position recognized by the PERB.

Unit – is defined as the number of hours in a shift scheduled for or worked by employees assigned to the Suppression Division of the Fire Department (i.e., 12 hours).

Tour – is defined as consecutive Units immediately before scheduled hours or days off under a work schedule as established by the Chief of Fire.

Complete Tour of Duty – is defined as consecutive Units immediately followed by scheduled hours or days off under a work schedule as established by the Chief of Fire.

Daily Rate – is defined as the daily rate of compensation calculated on an eight (8) hour day multiplied by the Employee's hourly rate (Hourly Rate x 8 = Daily Rate).

Hourly Rate – is defined as the hourly compensation calculated on an annual base salary divided by 2448 hours per year (Annual Base Salary ÷ 2448).

Administrative Personnel – is defined as any employee assigned to work in the Administrative Division of the fire department.

Suppression Personnel – is defined as any employee assigned to work in the Suppression Division of the Fire Department.

Unit/Day – is defined as the method of accumulation or usage of time depending on the employee's work schedule.

Apparatus (Minimum Manning) – is defined as an Engine, Ladder, or Squad utilized by employees assigned to the Suppression Division of the Fire Department.

## ARTICLE 4
## GRIEVANCE PROCEDURE

**Section 4. 1**    The grievance procedures set forth in this section are established in order to provide adequate opportunity for members of the Fire Department to bring forth their views relating to any unfair or improper aspect of their employment situation and to seek correction thereof.  Matters, which may be grieved, shall be limited to disputes or misunderstandings, which may arise between the parties concerning the application or interpretation of this Agreement.

(a)    Employees shall have the right to the unobstructed use of this grievance procedure.

**Section 4.2**    The procedure set forth below shall apply to all employee grievances as defined in Section 4.14.  Time limits indicated may be extended by mutual agreement.

**Section 4.3**    In any instance of a grievance the employee concerned shall present a written grievance within ten (10) calendar days of the grievance, or their knowledge of its occurrence, to the Deputy Chief in charge of the employee's division.  The grievance must be presented in writing setting forth the nature of the grievance, the section of the contract alleged to have been violated, and the remedy sought.

**Section 4.4**    The respective Deputy Chief shall hold a hearing within eight (8) calendar days of receipt of the grievance, excluding Saturdays, Sundays, and Holidays. However, if the grievant is not scheduled for work on day work during those eight (8) calendar days, the hearing shall be held the next time the grievant is scheduled for day work.  If the Deputy Chief is off, the grievance shall be sent to the Chief who shall assign the grievance to another Deputy Chief.

The Deputy Chief shall then respond in writing within five (5) calendar days, excluding Saturdays, Sundays, and Holidays.

**Section 4.5**   If after a thorough discussion with the respective Deputy Chief responsible pursuant to Section 4.4 the grievance has not been satisfactorily resolved, the aggrieved employee(s) shall, within eight (8) calendar days of the issuance of the Deputy Chief's written decision to an email account designated by the union, file a written appeal and request to discuss the grievance with the Fire Chief and Director of Human Resources.

**Section 4.6**   A hearing shall be held with the Fire Chief and Personnel Director/Designee within eight (8) calendar days, excluding Saturdays, Sundays, and Holidays, after the Fire Chief has received the written appeal. At such meeting discussion shall be limited to the issues raised in the grievance complaint, and an earnest effort shall be made to arrive at a satisfactory resolution of the issue. The Director of Human Resources/Designee and the Fire Chief shall respond in writing within five (5) calendar days, excluding Saturdays, Sundays, and Holidays.

**Section 4.7**   If after receipt of the written decision of the Director of Human Resources/Designee and the Fire Chief, the grievance has not been satisfactorily resolved, or if they fail to agree, the employee(s) may appeal to an impartial arbitrator by simultaneously filing for arbitration with the American Arbitration Association and providing notice of the arbitration filing to the Director of Human Resources and the Fire Chief not later than fourteen (14) calendar days after the issuance of the decision or the expiration of the time limit for the rendering of such decision.

**Section 4.8**   The impartial arbitrator shall be selected by the Union and the Employer. In the event they are unable to agree upon an impartial arbitrator within five (5) calendar days after the request for arbitration is made by either party, the impartial arbitrator shall be selected through and pursuant to the rules of the American Arbitration Association (AAA). The cost of the impartial arbitrator and all administrative expenses of the AAA relating to that particular case shall be borne by the losing party. The decision of the impartial arbitrator shall be made within thirty (30) calendar days of the closing of the hearing and shall be binding upon both parties. This impartial arbitrator will have no jurisdiction over disciplinary cases.

**Section 4.9**   The impartial arbitrator shall have access to all written statements and documents pertaining to the appeals in the grievance.

**Section 4.10**   Within thirty (30) calendar days after the selection of the impartial arbitrator, a hearing in connection with the appeal will be held. The employee may be represented by a representative of their choice. Hearings need not be conducted according to technical rules relating to evidence and witnesses.

### Section 4.11

(1)   At the conclusion of the hearing stage of the arbitration procedure and prior to any award or decision, the neutral arbitrator must ask the following questions of the grievant(s):

5

Have you been fairly and adequately represented by the Union?

Have you been fairly and adequately represented by counsel (if counsel is used)?

Did you have a fair and adequate opportunity to consult with counsel before the hearing?

Were there any witnesses that you wanted to call that were not called?  Do you still want them called?

Is there any evidence not presented that you wanted presented?  Do you still want it presented?

Is there anything else you want to offer in support of your position? Do you agree to have this grievance submitted to this arbitrator(s) for a final and binding decision?

(2)     Before the matter is submitted for a determination by the neutral arbitrator the employee must answer each of these questions in such a manner as to indicate that the grievant is completely satisfied with the hearing.  To this end the grievant shall sign a statement indicating that these questions have been asked and that the answers were indicative of complete satisfaction.

(3)     If the employee expresses dissatisfaction in the answers to any of the above questions, the hearing shall be continued until such time as the employee has an opportunity to be satisfied.  If the employee cannot be satisfied, or if the employee refuses to answer these questions, even after having been sent a copy by certified mail, the grievance must be jointly withdrawn from arbitration with no decision or award to be rendered.

(4)     No grievance alleging violation of any statutory or contractual provision prohibiting discrimination on the basis of race, color, religion, nationality, origin or age (as provided by law) may be arbitrated.

(5)     If because of legislation by the State of Delaware or federal government affecting employees covered by this Agreement; or because of a State of Delaware Court or federal court opinion or order affecting employees covered by this Agreement; or because of a State of Delaware or federal agency having issued a ruling or guideline affecting employees covered by this Agreement which allows an employee to maintain a court action and not be bound by the arbitration decisions on issues actually raised, all subsequent disputes of that type and kind shall no longer be heard in arbitration.

**Section 4.12**   Within thirty (30) calendar days of the conclusion of the arbitration hearing, the impartial arbitrator shall certify his/her findings, which shall then be final.

**Section 4.13**   Should the span of time attendant with the normal arbitration procedure provide probable cause to believe that either party will be irreparably harmed by the length of time normally required to pick an arbitrator, set a hearing date, prepare for the hearing, and await the arbitrators' ruling, either party may invoke expedited arbitration as provided herein:

6

(1)    A joint telephone call will be made to the Philadelphia office of the American Arbitration Association requesting the names of five (5) arbitrators who can be available for a hearing within five (5) calendar days excluding Saturday, Sunday and Holidays and provide an award within three (3) calendar days with an opinion in thirty (30) calendar days.

(2)    The parties shall then within one (1) calendar day, excluding Saturdays, Sundays, and Holidays unless the arbitrator can be reached during that time, rank order all the names on the list. The arbitrator ranked highest on both lists shall be the neutral arbitrator.

(3)    Post hearing briefs, if necessary, are to be postmarked within three (3) calendar days of hearing date, excluding Saturdays and Sundays. Should the need for expedited arbitration be challenged, that issue shall be heard and determined first by the arbitrator at the time of the hearing. The arbitrator's decision as to the need for expedited arbitration shall be guided and bound by the precedent usually followed by the Chancery Court in determining the appropriateness of granting a Preliminary Injunction.

The award and opinion resulting from an expedited arbitration case shall be restricted to the grievance submitted and shall have no binding precedential value.

The parties recognize and agree that expedited arbitration is an extraordinary procedure and as such is not intended for use in every or even most grievances.

**Section 4.14**    The Union shall be presumed to be the authorized representative of all members of the bargaining unit in grievance proceedings, unless an individually aggrieved employee, in writing (with a contemporaneous copy given to the Union President), rejects its representation.

**Section 4.15**    Where the alleged grievance involved a matter of general application impacting on a significantly large number of employees, the Union may initiate a grievance on behalf of the entire group involved. The Union may raise the issue under Section 4.5 of the Grievance Procedure within thirty (30) days of the date the grievance or of the Union's knowledge of its occurrence. All individuals in the group that will be affected by the grievance and its resolution shall be bound to any resolution which is accepted by the Union Committee and shall not thereafter again raise the issue individually.

**Section 4.16**    A Labor-Management meeting will be held during the first week of each month, the exact date to be confirmed with the Chief of the Fire Department. The City representatives shall be at least the following: the Chief of the Fire Department and the Deputy Chief of Operations. The Union Committee shall be composed of a maximum of seven (7) members of the Union who will be designated by the Union in January of each year. If the Union designates employees who are on duty, time off with pay shall be granted for no more than two employees, who will be considered part of the minimum manning requirement. The meetings shall not exceed one and one-half (1 ½) hours per month unless extended by mutual agreement. A written agenda of topics to be discussed shall be submitted by the Union seven (7) calendar days prior to a meeting. If no agenda is submitted by the required date, no meeting need be scheduled. These meetings are not intended to by-pass the Grievance Procedure or to be

considered contract negotiation meetings but are intended as a means of fostering good employment relations through communications between the parties. The City shall keep minutes of all Labor-Management meetings and distribute the minutes to the Union Committee within seven days of each meeting.

## ARTICLE 5
## HOLIDAYS

**Section 5.1**    The following and such other days as the Mayor may designate shall be holidays with pay: New Year's Day; Martin Luther King Day; President's Day; Good Friday; Memorial Day; June 19th, Juneteenth, known as Freedom Day; the Fourth day of July, known as Independence Day; the first Monday in September, known as Labor Day; Veteran's Day; Thanksgiving Day; Christmas Day; and the day of the general election as it biennially occurs.

The City shall roll compensation for Juneteenth equivalent to .38% of base salary into each member's base pay. The award of this benefit shall be retroactive to June 19, 2021, for all members currently employed within the unit as of July 1, 2023.

Employees shall not be paid for a holiday (8 hours pay) if they are absent from work on the employee's last scheduled workday before the holiday, the holiday (if scheduled to work for the holiday), or the employee's next scheduled workday following the holiday unless excused for one of the following reasons: (a) medical absence, verified by a physician; (b) attending court as a witness under a subpoena or as a juror; or (c) death in the family as defined by this contract. The stipulations in this paragraph are not applicable if the employee actually works on the holiday.

The deletion of Lincoln's Birthday and Columbus Day holidays shall not reduce the salary rates set forth in Article 16 of this Agreement. In the case of Administrative Personnel only, these deleted holidays will be replaced or converted into two (2) floating holidays which will be scheduled off in accordance with departmental regulations within the calendar year they are earned.

**Section 5.2**    Fire Suppression Personnel

(a)    Whenever civilian employees are excused from work by an Executive Order of the Mayor, or for any weather emergency for any day not covered by ordinance or statute the firefighters shall receive payment at straight time rates for those who are required to report for duty for that tour. No firefighter shall be compensated for more than 16 hours (8 hours per unit as defined in Article 3) in any one tour. Any member who was scheduled on vacation on a holiday not designated on Section 5.1 shall receive 16 hours pay at straight time rates.

(b)    Whenever civilian employees are excused from work by an Executive Order of the Mayor, or for any weather emergency for a portion of the day i.e., early dismissal or late reporting, the firefighters shall receive payment at straight time rates for those who are required to report for duty for that tour. Firefighters will receive a like number of hours

as compared to city employees. No firefighter shall be compensated for more hours than the working shift.

### Section 5.3    Administrative Personnel

(a)    Whenever civilian employees are excused from work by an Executive Order of the Mayor, or for any weather emergency for any day not covered by ordinance or statute the firefighters shall receive payment at straight time rates for those who are required to report for duty for that day. No firefighter shall be compensated for more than (8 hours per unit as defined in Article 3). Any member who was scheduled on vacation on a holiday not designated in Section 5.1 shall receive 8 hours pay at straight time rate.

(b)    Whenever civilian employees are excused from work by an Executive Order of the Mayor, or for any weather emergency for a portion of the day i.e., early dismissal or late reporting, the firefighters shall receive payment at straight time rates for those who are required to report for duty for that day. Firefighters will receive a like number of hours as compared to city employees. No firefighter shall be compensated for more hours than the working suppression shift.

This section shall apply only to those employees of the Fire Department who are scheduled to work during the day/tour or portion of the day/tour covered by the Executive Order.

## ARTICLE 6
## VACATION

### Section 6.1    Vacation Picks

Annual vacation picks will take effect every January 1st.

### Section 6.2    Vacation Accumulation

All paid vacation for employees of the Fire Department shall be calculated as follows and will be compensated based on the daily rate:

(a)    One (1) unit/day of vacation per month during the first six (6) months of continuous employment; however, no vacation may be taken until the employee has worked at least six (6) months.

(b)    One (1) unit/day of vacation per month after the completion of the first six (6) months of continuous employment until the next January 1st.

(c)    Twelve (12) units/days of vacation after completion of one (1) year of continuous employment from the date of employment.

(d)    Fourteen (14) units/days of vacation after completion of six (6) years of employment from date of employment.

9

(e)     Twenty (20) units/days of vacation after completion of ten (10) years of employment from date of employment.

(f)     Twenty-two (22) units/days of vacation after completion of thirteen (13) years of employment from date of employment.

(g)     Twenty-five (25) units/days of vacation after completion of sixteen (16) years of employment from date of employment.

### Section 6.3     Vacation Carry-Over

#### (a)     **Fire Suppression Personnel**

Any member assigned to Fire Suppression may carry over to the next calendar year up to ten (10) vacation units.  Carried over days shall not be selected until all other members have selected their entire vacation allotment (12-14-20-22-25) including the vacation holiday.  However, a member may at any time, by a written request to the Chief, carry over into the year in which retirement is planned an additional ten (10) units to be taken just prior to retirement.  The election to carry over the banked vacation units shall not be considered a declaration of intent to retire, and the member shall have no obligation to retire by carrying over the additional units, nor will they be eligible to exercise this option for future vacation selections.

#### (b)     **Administrative Personnel**

Any member assigned to the Administrative Division may carry over to the next calendar year ten (10) vacation days.  However, a member may at any time, by a written request to the Chief, carry over into the year in which retirement is planned an additional ten (10) workdays to be taken just prior to retirement.  The election to carry over the banked vacation period shall not be considered a declaration of intent to retire, and the member shall have no obligation to retire by carrying over the additional period, nor will they be eligible to exercise this option for future vacation selections.

### Section 6.4     Vacation Usage

Vacation days shall be taken in the vacation period applicable unless the vacation days are accumulated under the provisions of Section 6.3.  All vacations shall be selected by seniority in rank and seniority in the platoon and/or division and/or administrative unit a member is assigned.

If an individual's vacation is affected by an extenuating circumstance defined as quarantine or other absence due to the City's infectious disease protocol, on-duty injury, bereavement leave, jury duty, military leave, or court appearance as defined in Section 9.4 that would prevent utilization of this time as scheduled, then upon his/her return to duty, they will be given the option to reselect from an open vacation slot or receive payment for it, except at retirement, where members would be compensated for vacation days.

Upon retirement, all unused vacation units shall be exhausted on terminal leave.

**Section 6.5    Vacation Selection Process**

(a)    *Fire Suppression Personnel*

Vacation time shall be selected in the following manner by members assigned to Fire Suppression companies or units.

**NOTE:** Members will select using the following formula: Two units of vacation for each tour of duty.

(1)    All members shall select up to five (5) vacation tours on their first pick. These tours must be picked in succession.

(2)    When all eligible members have completed their initial vacation pick, the remainder of vacation tours (two units) shall be picked until exhausted, with the exception of the number of requested carry-over units.

(3)    All carry-over vacation units may be taken in one (1) or two (2) unit increments, provided there is an open vacation slot available on the original vacation board for the requested unit(s) in the respective platoon. The Deputy Chief of Operations may permit additional members to utilize their carry-over unit(s) based on departmental needs and the Deputy Chief's discretion.

(4)    Carry-over vacation unit(s) used for known open slots on the shift vacation calendar must be requested no later than 24-hours prior to the start of the requested shift (0800 Hours for Day Units or 2000 Hours for Night Units). The member requesting to use the carry-over vacation unit(s) will call the on-duty officer at their regular assignment to make the request. The on-duty officer will notify the appropriate on-duty Battalion Chief of the request. The selection will be awarded on a first-come, first-served basis. The on-duty officer will notify the requesting member if the request has been awarded or declined due to another member choosing the selection prior to their request and closing out the open slot.

(5)    Open vacation slots that become available during the year will be handled by the Deputy Chief of Operations utilizing the following method:

(a)    The Deputy Chief of Operations will notify all members by email when an original vacation slot becomes available. The recently open vacation slot will remain open for seven (7) calendar days for members to submit their request.

(b)    In the event the vacancy does not permit a seven (7) day window for submission, members may utilize the procedure outlined in Section 6.5(a)(4).

(c)    Members wishing to utilize any of their carry-over unit(s) for a recently open vacation slot will submit the request via a

written memorandum to the Deputy of Operations through their commanding officer.

(d)     The Deputy Chief of Operations will award the open slot based on seniority using the platoon-rotational list and will follow the limitations outlined in Section 6.8.

(6)     All members will have the option to cash-in any unused units in increments of two units only, which will be payable in the second pay period in June of the calendar year the days were accumulated. Employees must declare their intention to cash-in these days when they complete their vacation picks.

(b)     **Administrative Personnel**

Vacation time shall be selected in the following manner by members assigned to the Administrative Division of the Fire Department:

(1)     Members may take their vacation at any time during the year as long as it conforms to the requirements of the Administrative Division of the Fire Department.

### Section 6.6     Vacation Holidays

(a)     The only vacation holidays earned will be for those assigned to Fire Suppression and will be based on the following schedule:

(1)     After completion of 16 years: 1 vacation holiday.

(b)     All bargaining unit employees will be eligible for the following:

(1)     For Calendar Year 2011, each member will receive a cash payment of 8 hours of Vacation Holiday Pay.

(2)     For Calendar Year 2012, each member will receive a cash payment of 24 hours of Vacation Holiday Pay.

### Section 6.7     Vacation Approval

Members of the Fire Department assigned to any of the divisions of the Fire Department shall obtain approval from their respective Division Commanders for their selected vacation days. All Division Commanders and those other members of the Fire Department assigned directly under the command of the Chief of Fire shall obtain his approval for their selected vacation days.

### Section 6.8    Vacation Limitations

(a)    No more than five (5) Fire Suppression members of the Fire Department per platoon shall be permitted on vacation at any one time exclusive of Battalion Chiefs.

(b)    No more than two (2) Fire Suppression Officers (Captain or Lieutenant) per platoon shall be permitted on vacation at the same time.  No more than one (1) Captain shall be permitted on vacation at the same time.

(c)    Two (2) Fire Suppression Lieutenants assigned to the same platoon shall be permitted on vacation at the same time if no Fire Suppression Captain assigned to that platoon has chosen the same vacation period.

(d)    Four (4) Fire Suppression Officers assigned to the same Fire Suppression fire company shall not be permitted on vacation at the same time.

### Section 6.9    Advanced Vacation Payments

Pay for all vacations shall be based on the rate of pay of the employee at the time of vacation and will be paid in advance of a regularly scheduled vacation.  A letter requesting advance vacation pay shall be submitted thirty (30) calendar days prior to going on vacation, if a member is requesting advance vacation pay.

### Section 6.10    Completion of Vacation Schedule

The vacation schedule for the following calendar year shall be completed and in the office of the Chief of Fire by December 15th each year.

### ARTICLE 7
### SICK LEAVE

**Section 7.1**    Sick leave shall be earned by all Firefighters covered by this Agreement from the commencement of employment but may not be used until an employee shall have completed three (3) months of continuous employment.  Time worked under emergency or temporary appointment, when followed immediately by permanent or provisional appointment may, upon the recommendation of the Fire Chief or the department head and approval of the Director of Human Resources, be included in computing length of continuous service.

**Section 7.2**

(a)    Sick leave shall be granted to employees when they are incapacitated from the performance of their duties by sickness, injury or for medical reason, when certified by a dental or optical examination, or by a physician, or medical professional. Sick leave shall also be granted when a member of the immediate family (i.e., spouse, children, parents, brother, sister, grandparents, spouse's grandparents, mother-in-law, father-in-law, son-in-law, daughter-in-law, grandchildren, brother-in-law, sister-in-law or any person who stands in loco parentis to the Employee or any person or relative with whom the Employee is making

13

his/her home) is afflicted with a contagious disease or requires the care and attendance of the employee, or when, through exposure to a contagious disease, the presence of the employee at their employment position would jeopardize the health of others. Furthermore, if an employee utilizes sick time while caring for an immediate family member, a certificate from a physician will be required.

(b)      Any member who is sent home as a result of an illness after working less than one-half unit/day will be charged a unit of sick leave for that unit. Any member who is sent home as a result of illness after working more than one-half unit/day will not be charged a unit of sick leave for that unit. They will be charged one (1) unit of sick leave for each subsequent unit they are off provided they comply with Article 7.7(a).

(c)      Members who are off sick leave for the first unit of the tour will be allowed to report back to duty for the second unit of the tour provided they comply with Article 7.7(a).

**Section 7.3**    Sick leave accumulation shall be based on a five (5) day work week. Overtime shall not be construed as to add extra time to accumulated sick leave. Calculation of sick leave accumulation for all eligible employees shall be at the rate of one (1) day/unit per month on the thirtieth (30th) day of each month, accumulated to a maximum of two-hundred forty (240) days.

The schedule for all eligible employees is as follows:

| Number Years Employed | Rate of Accumulated Sick Leave/Mo. | Rate of Accumulated Sick Leave | Total Accumulated Sick Leave |
|---|---|---|---|
| 1st | 1-day/unit | 12 days/units | 12 days/units |
| 2nd | 1-day/unit | 12 days/units | 24 days/units |
| 3rd | 1-day/unit | 12 days/units | 36 days/units |
| 4th | 1-day/unit | 12 days/units | 48 days/units |
| 5th | 1-day/unit | 12 days/units | 60 days/units |
| 6th | 1-day/unit | 12 days/units | 72 days/units |
| 7th | 1-day/unit | 12 days/units | 84 days/units |
| 8th | 1-day/unit | 12 days/units | 96 days/units |
| 9th | 1-day/unit | 12 days/units | 108 days/units |
| 10th | 1-day/unit | 12 days/units | 120 days/units |
| 11th | 1-day/unit | 12 days/units | 132 days/units |
| 12th | 1-day/unit | 12 days/units | 144 days/units |
| 13th | 1-day/unit | 12 days/units | 156 days/units |
| 14th | 1-day/unit | 12 days/units | 168 days/units |
| 15th | 1-day/unit | 12 days/units | 180 days/units |
| 16th | 1-day/unit | 12 days/units | 192 days/units |
| 17th | 1-day/unit | 12 days/units | 204 days/units |
| 18th | 1-day/unit | 12 days/units | 216 days/units |
| 19th | 1-day/unit | 12 days/units | 228 days/units |
| 20th | 1-day/unit | 12 days/units | 240 days/units |

Section 7.4

(a) **Administrative Personnel**

Administrative Personnel shall be charged one (1) day of sick leave for every scheduled workday that they are off sick and will be compensated at the daily rate.

(b) **Fire Suppression Personnel**

Fire Suppression Personnel shall be charged one (1) unit of sick leave for every scheduled work unit that they are off sick and will be compensated at the daily rate.

**Section 7.5**    One (1) day/unit of credited sick leave will be allowed for each calendar month of continuous service except for an employee that has been suspended and has not worked at least thirteen (13) days in Administration in any one month or at least 5 tours in Suppression in any one (1) month.

**Section 7.6**    Sick leave accumulated by firefighters on the effective day of this Agreement from which this section derives shall be credited to their personnel record.

**Section 7.7**    In order to qualify for sick leave, all employees must comply with the following conditions:

(a)    Report off sick by notifying their immediate supervisor one (1) hour prior to starting time if they are off sick or will be off sick in order to care for an immediate family member.

(b)    After three (3) days/units of continued absence, upon return to work, a treating physician's certificate shall be furnished by the firefighter to the immediate supervisor satisfactorily demonstrating why the firefighter was unable to work, or that he/she was caring for a sick immediate family member.  All physicians' certificates shall be forwarded to the Medical Dispensary and will become a part of the firefighter's permanent medical record.

If there should be a question regarding the appropriateness of the medical certificate mentioned in the above paragraph, the employee will have up to one (1) week after the member has received written notification to provide a more detailed certificate in order to clarify the matter.  If an employee should fail to provide this information within the prescribed time period, their pay will be docked accordingly.

(c)    If an employee is absent from work due to personal illness or illness of an immediate family member for longer than nine (9) consecutive calendar days, the firefighter shall telephone the immediate or on-duty supervisor to inform him/her of the anticipated length of continued absence due to illness.  A Family and Medical Leave Act Certification of Health Care Provider Form and a City Leave of Absence Form must be received by the immediate or on-duty supervisor by the fifteenth (15) calendar day as written confirmation of the anticipated length of absence.

15

**Section 7.8**    Firefighters taking time off and not complying with the conditions of Paragraphs (a), (b) and (c) of Section 7.7 will not be paid for time off.

**Section 7.9**    When a Firefighter has exhausted their accumulated sick leave, all unused vacation time must be taken, with the exception of one (1) week for administrative personnel and four (4) units for suppression personnel. At the end of this time if the employee is still away from the job because of sickness, the Chief of Fire shall make a recommendation to the Director of Human Resources as to whether additional time should be approved with or without pay. The Director of Human Resources will review the matter and make a recommendation if additional sick time with pay is to be granted to the firefighter.

**Section 7.10**    A firefighter who resigned in good standing and who has been reinstated within one (1) year of said resignation may have credited to their record all sick leave that they had accrued at the time of their separation. This section shall not apply to a firefighter who has either resigned or retired and previously exercised their right to cash in unused sick leave.

**Section 7.11**    Sick leave shall be certified by the Fire Chief upon forms prescribed by the Director of Human Resources. The Fire Chief shall maintain complete and accurate leave records. Records of sick leave accumulated and taken shall be available to the firefighter.

**Section 7.12**    Regularly scheduled time off will not be counted against allowable sick leave if it falls during a period of sick leave.

**Section 7.13**

(1)    Effective January 1, 2006, an employee, who upon retirement has accumulated at least 100 days of unused sick leave but less than 199 days of unused sick leave, shall be paid thirty percent (30%) of the unused sick leave working days.

(2)    Effective January 1, 2006, an employee, who upon retirement has accumulated at least 200 or more days of unused sick leave, shall be granted the right to retire from active duty by fifty percent (50%) of the unused sick leave working days earlier than the employee's normal effective date of retirement.

(3)    Payment under this Section shall be made in a lump sum on the next regular pay date after retirement.

## ARTICLE 8
## WORKER'S COMPENSATION

**Section 8.1**    Employees injured on the job in the performance of their assigned duties will be covered by the Worker's Compensation Plan, and their time off will not be chargeable to either their accumulated sick leave or their vacation time. The City shall pay the Firefighters injured in the performance of their assigned duties the difference between compensation pay and the sum they would have received in their regular pay.

16

**Section 8.2**      An employee will be placed on modified duty after illness or injury (occupational or non-occupational) if such duty is available and is within the employee's ability, even if such duty places the employee in another company and/or unit within the Fire Department.

Determinations as to the employee's ability to perform available modified duty work assignments will be made by the employee's physician with the agreement of the employer's physician. If the physicians disagree as to the employee's ability to perform such duty, then the matter shall be referred to a third physician mutually agreed upon by the employee's physician and the employer's physician, whose decision shall be final and binding. The employee and the employer shall share equally the cost of the third physician.

Determinations as to the availability of the modified duty work assignments within the employee's ability will be made by the Chief of Fire or designee who will set forth in writing his or her reasons for allowing or disallowing the placement of an employee in a modified duty work assignment and will provide a copy of such written determination to the employee and Director of Human Resources.

### ARTICLE 9
### AUTHORIZED LEAVE OF ABSENCE

### Section 9.1    UNION BUSINESS

Leaves of absence with pay will be granted for no more than six (6) members to attend and serve as delegates at conventions, organization conferences, seminars, and "special functions" (as defined below). Union leave will be accumulated at the rate of thirty (30) personnel days/units per year for the term of this contract. Any unused days/units may be carried over into the next year of this contract. Such leave will be granted with pay only for days/units when the employee would have been scheduled for duty. Samples of "special functions" shall be the Vaudeville Show, the Union Labor Day Picnic or other Union social events.

The Chief of Fire will consider, on a case-by-case basis, accommodating requests from the Union President or designee to attend various community related meetings.

(a)      Subject to the provisions of this Article regarding military leave and all applicable federal and state statutes and regulations, seniority, sick leave, and vacation shall not accumulate during authorized leaves of absence.

(b)      Up to three (3) members of the Union's negotiating team will be allowed off with pay after the start of a shift, for a maximum of four (4) hours per session, for not more than twelve (12) hours total, for labor contract negotiation related matters prior to the start of negotiations. Such time shall only be granted within reasonable proximity to the beginning of negotiations and shall not continue after negotiations have begun.

(c)      Of the seven (7) Union officials, no more than four (4), including at least the President and Secretary/Treasurer will be scheduled, or allowed time off from duty after the start of the shift to attend the regular membership meetings and the regular monthly

17

executive board meeting. It shall be the duty of the Union to provide the Fire Chief with a current list of executive board members as well as a list of the schedule and date of the meeting.

The President of the Union will be given two (2) hours per month to meet with the Union attorney concerning Union matters. Such time off shall not be cumulative and if not used in a given month shall be lost.

(d)     The President or Chairman of the Grievance Committee shall be granted time off with pay to attend grievance and arbitration hearings.

(e)     There has been no other general grant of time off with pay for Union business other than that listed in this Article.

### Section 9.2    BEREAVEMENT LEAVE

(a)     **Administrative Personnel**

(1)     All firefighters will be granted four (4) consecutive working days off for a death of one of the following members of the firefighter's immediate family: spouse, children, brother, sister, parents, grandparents, mother-in-law, father-in-law, any person who stands in loco parentis to the employee, and any person or relative with whom the employee is making his or her home. These days shall be consecutive. The bereavement period ends five (5) calendar days after the interment. If an employee would be granted additional leave under Section 40-336 of the City Code, such leave shall be granted.

(2)     All firefighters will be granted up to four (4) working days off for a death of one of the following members of the firefighter's immediate family: spouse's grandparents, son-in-law, daughter-in-law, grandchildren, brother-in-law, and sister-in-law. The bereavement period ends three (3) calendar days after the interment. If an employee would be granted additional leave under Section 40-336 of the City Code, such leave shall be granted.

(3)     The time off allowed in the case of death in the firefighter's immediate family shall not be chargeable to either sick leave or vacation time. In the event of a death of a near relative not listed above, up to two (2) days' vacation time may be taken.

(4)     Additional time off may be granted for extenuating circumstances as determined by the Chief of Fire or Designee.

(b)     **Suppression Personnel**

(1)     All firefighters will be granted two (2) consecutive tours off for a death of one of the following members of the firefighter's immediate family: spouse, children, brother, sister, parents, grandparents, mother-in-law, father-in-law, any person who stands in loco parentis to the employee, and any person or relative with whom the employee is making his or her home. The bereavement period ends five (5) calendar days after the interment. If an employee would be granted additional leave under Section 40-336 of the City Code, such leave shall be granted.

18

(2)    All firefighters will be granted one (1) tour off for a death of one of the following members of the Firefighter's immediate family: spouse's grandparents, son-in-law, daughter-in-law, grandchildren, brother-in-law, and sister-in-law. The bereavement period ends three (3) calendar days after the interment. If an employee would be granted additional leave under Section 40-336 of the City Code, such leave shall be granted.

(3)    The time off allowed in the case of death in the Firefighter's immediate family shall not be chargeable to either sick leave or vacation time. In the event of a death of a near relative not listed above, up to one (1) tour of vacation time may be taken.

(4)    Additional time off may be granted for extenuating circumstances as determined by the Chief of Fire or Designee.

### Section 9.3    MILITARY LEAVE

(1)    "Armed Forces" is defined to include the Army, Navy, Marine Corps, Air Force and Coast Guard. "Reserve Components" is defined to include the federally recognized National Guard and Air National Guard of the United States, the Officers Reserve Corps, the Regular Army Reserve, the Air Reserve, the Enlisted Reserve Corps, the Naval Reserve, the Marine Corps Reserve and the Coast Guard.

(2)    Any employee of the City who is a member of the National Guard or any reserve component of the Armed Forces of the United States will be entitled to a leave of absence without loss of time or annual leave during which they are engaged in the performance of official duty or training in this state, or in the United States, under competent orders. While on such leave they shall be paid their regular salary, less their military pay, not to exceed a total of fifteen (15) working days for Administrative Personnel or seven (7) tours for Suppression Personnel in any one (1) calendar year. Military Leave may be utilized in one (1) unit increments.

(3)    To receive payment of salary, an employee must, prior to their leave, file with the Personnel Office of the City a copy of their official orders and upon return a certification from their commanding officer of performance of duty in accordance with terms of the orders.

(4)    Full service credit with the City shall be allowed permanent employees for time spent in the military service, provided that the employee goes directly from department employ into military service and makes application for re-employment within ninety (90) days after being released under honorable conditions from such military service.

(5)    It shall be the policy of the City to guarantee to its permanent employees who, during a national emergency, volunteer or are called for active military service, a position upon their return to civilian life equal to the one they left, provided that the requirements set forth in the above paragraph are fulfilled.

(6)    Permanent employees who, with ninety (90) days of service, volunteer or are called for active military service shall be paid from the date they leave City employ for all accrued vacation to their credit at that date. The employee, at their discretion,

19

may elect not to be paid for vacation leave but to leave it to their credit for use upon returning to the department.

(7)    These same policies shall be applicable to permanent employees who at any time are subject to the provisions of the Selective Service Act.

### Section 9.4    JURY DUTY AND COURT LEAVE

In recognition that every citizen is obligated to serve as a juror when called upon to do so, any firefighter called for jury service or subpoenaed as a witness in a matter arising out of the firefighter's employment by the City will be granted leave with full pay, less any jury pay, or witness fee received. To receive such pay, the firefighter must file a copy of his/her jury summons or subpoena with the Personnel Department prior to commencement of the leave; upon the firefighter's return, he/she must provide the Personnel Department with documentation of service and payment of any fees received as a juror or witness as provided in the summons or subpoena.

### Section 9.5    PAID PARENTAL LEAVE

Employees shall be granted paid parental leave as defined under Section 40-341 of the City Code, on terms at least as favorable as those provided to employees of the City not covered by this Agreement.

### ARTICLE 10
### HEALTH AND WELFARE

### Section 10.1

(a)    Through June 30, 2020, employees covered by this Agreement shall be offered three medical plans:  Point of Service 100/80 ("POS"); Point of Service 90/70 ("POS (2)"); and Simply Blue EPO Plan 100 ("EPO").

(b)    Effective July 1, 2020, employees covered by this Agreement, who were hired before July 1, 2020, shall be offered three medical plans:  PPO 100/80 ("PPO1"), PPO 90/70 ("PPO2"), and Simply Blue EPO Plan 100 ("EPO").  These plans shall be provided to employees covered by this Agreement plus eligible dependents during the term of this Agreement.  Effective July 1, 2020, employees covered by this Agreement who were hired after July 1, 2020, shall be offered two plans:  PPO2 and EPO.

Benefits and required employee contributions and co-pays provided under these plans shall be attached to and made part of this Agreement as Appendix "A."

(c)    Healthcare (Effective 7/1/20)

20

- • Employee Share
  - ▪ 12% of total premium, or
  - ▪ 10% of total premium if employee meets with HCP and gets blood screening
- • PPO1 Plan closed to new hires effective 7/1/2020
- • $150 co-pay for emergency room visits, effective 7/1/2020 (up from $50)
- • Mandatory generic drug prescriptions, effective 7/1/2020
- • Mandatory annual physical and age/gender specific lab screenings for 2% premium discount

### (d)   Spousal Coordination

Effective July 1, 2024, spouses of employees covered by this Agreement who are eligible for health care coverage or retiree health care coverage through their own employer are ineligible for coverage under the medical plans or the Retiree Medical Program offered by the City. This provision does not apply to Medicare eligible spouses who are enrolled in the City's Medicare group supplement.

### (e)   Domestic Partners

Effective July 1, 2024, the City will discontinue providing coverage for domestic partners provided for in HR Policy 403.1 Declaration of Domestic Partnership – Application for Health Insurance Benefits

(f)   Upon retirement, Employees shall have the right to choose, in writing, to continue coverage with the City of Wilmington's health insurance plans, at the Employee's expense, with a deduction from pension payments where applicable, unless the Employee qualifies under the stipulations outlined in subsection 10.1 (g).

### (g)   **Retiree Medical Program**

(1)   **Title** – This subsection shall be known as the City of Wilmington's Retiree Medical Program. This program will be identical to the medical insurance benefits that are provided for active full-time City employees, except for retirees who are sixty-five (65) years or older. The City reserves the right to offer a different plan for retirees who are sixty-five (65) or older, provided that the plan offers benefits comparable to those benefits offered to active employees i.e., medical and prescription coverage of similar value.

(2)   **Eligibility** – To be eligible for Retiree Medical Program ("Program") benefits, the City employee must first be a retired bargaining unit member who is receiving a pension benefit pursuant to the State of Delaware "County and Municipal Pension" program. The Program is applicable to all members of this bargaining unit who are active (on the City payroll) full-time employees as of January 1, 2000 and all employees first employed in a full-time position after said date. Any bargaining unit employee who is eligible for City employee pension benefits pursuant to any of the City employee pension benefit programs shall then meet the following requirements in order to receive Retiree Medical Program benefits pursuant to this section:

a.  Uniformed employees who are not less than fifty-five (55) years of age with not less than twenty (20) years of service as City employees.

(3)    **Healthcare Coverages** – This Program shall pay not less than eighty percent (80%) of the blended rate up to a maximum of eight thousand dollars ($8,000.00) for eligible retirees who are less than sixty-five (65) years of age.  The Program shall pay not less than eighty percent (80%) of the blended rate up to four thousand dollars ($4,000.00) for retirees who are sixty-five (65) years of age or older.  "Blended rate" shall mean the average cost to the City for all active participants in the program.

(4)    **Spousal Coverage**

a.  Spouses and other eligible dependents of covered bargaining unit employees who are eligible under Subsections 10.1(d) Spousal Coordination and (g)(2) Eligibility, as outlined above, shall be permitted to participate in the Retiree Medical Program group plan at the group rate for the lifetime of the covered spouse.  Premiums shall be the responsibility of the retired City employee or covered spouse.  Spouses shall continue as long as they are receiving a City pension benefit.

b.  The premiums for spousal and/or other eligible dependents covered shall be published annually and shall reflect the City's actual cost for that coverage.

(5)    **Dental Benefit** – a dental benefit shall also be optional at the discretion of the retiree.  Persons opting for the dental benefit shall be entirely responsible for payment of the requisite premium.

(6)    **Disability** – Any bargaining unit employee with at least fifteen (15) years of service, who otherwise qualifies for a City disability pension benefit, shall be eligible for the Retiree Medical Program benefits of this section.

(7)    Notwithstanding any other provision of this Agreement, the eligibility requirements and retiree medical benefits for any employee hired on or after July 1, 2011, shall be determined in accordance with the terms and provisions of Section 39-5 of the Wilmington City Code relating to individuals hired on or after July 1, 2011.

**Section 10.2**    The Employer will provide Dental and Long-Term Disability Plans during the life of this Agreement.  The benefits and required contributions and co-pays under these plans shall be attached to and made part of this Agreement as Appendix "A-1."  The Employer will provide two Vision Plans.  Vision Base Plan will be provided at no cost to all employees with the option of purchasing enhanced vision benefits ("Buy-Up Plan") as outlined in Appendix "A-2."

**Section 10.3**    Any employee who can show proof of other health insurance coverage shall be eligible for a $200.00 per month opt-out, effective upon ratification of the Contract.

**Section 10.4**    The City's responsibility under this article does not extend to liability for the failure or refusal to honor an employee's claim, and such claims shall not be subject to the grievance and arbitration procedures set forth in Article 4 of this Agreement.

**Section 10.5**    The City agrees to provide term life insurance for each Firefighter equal to one and one half (1½) times his/her salary with a maximum of $50,000.00, effective upon ratification of the Contract.  The cost of this life insurance with the exception of $2.00 shall be borne by the employer.  The $2.00 fee that shall be assessed against each employee covered by this benefit shall be deducted yearly from the employee's regular paycheck.  Upon termination of employment, the Employer agrees to provide Firefighters the option to continue their term life insurance coverage in accordance with the provisions outlined in the plan document at the Firefighter's own cost.

**Section 10.6**    Should the employer be obligated by law to contribute to a government operated or mandated insurance program, national or otherwise, which duplicates the benefits provided by the employer under any insurance policy currently in effect as a result of this agreement, it is the intent of the parties that the employer not be obligated to provide double coverage; and to escape such double coverage the employer shall be permitted to cancel benefits or policies which duplicate, in whole, compulsory governmental sponsored insurance programs.  There shall be no reduction in benefits provided.  If any benefit is partially duplicated, only the duplicated part will be omitted.

**Section 10.7**    Employees shall have an annual physical exam conducted by the Fire Physician or by an In-Network doctor on City time at no cost to the Employee.  At the Employee's option, the exam will include TB, HIV, and Hepatitis-B screening.

## ARTICLE 11
## WORKING CONDITIONS

### Section 11.1  UNIFORMS

The Wilmington Fire Department will adopt a change in uniforms as follow:

(a)    All work uniforms will meet current N.F.P.A. standards for station work uniforms.

(b)    All Suppression members will wear the uniforms provided by the department, those uniforms authorized or mutually agreed to by the department with the departmental patch.

(c)    All Administrative members will wear shirts and pants as provided by the department.

### Section 11.2

(a)    All fire suppression personnel will be provided with two (2) short sleeve shirts, two (2) long sleeve shirts, and two (2) pairs of pants, one (1) pair of shorts, one (1)

polo shirt and four (4) Wilmington Fire Department t-shirts. Uniforms for all members will be replaced as needed upon turn-in of condemned shirts, shorts, and pants.

All administrative personnel will be provided with four (4) short sleeve shirts, four (4) long sleeve shirts, and four (4) pairs of pants. Uniforms for all members will be replaced as needed upon turn-in of condemned shirts and pants.

(b)    Employees will have the option to use approved regulation leather boots, which meet the N.F.P.A. standards. If they choose this option, they will be required to pay the difference between the cost of the departmental issued rubber boots and the leather ones.

(c)    **TURN-OUT GEAR.** The City shall be totally responsible for supplying to all Firefighters turn-out gear and equipment required by the Rules and Regulations at its sole cost and expense, including two (2) protective hoods, two (2) helmet liners, a leather radio strap and holder, two (2) sets of boots, two (2) sets of firefighting gloves, rescue gloves, a firefighting gear bag, and a plastic tote that is large enough for storing their secondary set of firefighting gear. If a Firefighter does not complete their probationary period, they are required to pay the City for the cost of this equipment; such cost to be deducted from their final pay.

(d)    **REPLACEMENT.** All worn out and damaged gear and equipment will be replaced at the City's expense after inspection and certification by the Fire Chief or his delegate.

(e)    Firefighters assigned to the Fire Marshal's Office and members riding the ambulance will have the option of receiving a protective vest.

(f)    Retention of Items Upon Retirement. Upon retirement, an employee who retires in good standing from active duty shall, upon the employee's request, retain their Fire Department Badge, Helmet, and Class A Uniform. An employee who dies prior to retirement, upon request by the employee's spouse/partner/family, shall retain their Fire Department Badge, Helmet, and Class A Uniform.

### Section 11.3

(a)    **Call Back.** In the event a Firefighter is called back outside their regular shift and after having logged out, they shall be paid a minimum of four (4) hours pay at the time of reporting. Said pay shall be calculated at the rate of time and one-half. In the event the Firefighter is required to work any period in excess of four (4) hours, they shall be paid at the rate of time and one-half for all hours actually worked.

(b)    **Call In Early.** In the event a Firefighter is "called in early," i.e., ordered to report earlier than the starting time for the next regular shift, they will be compensated two (2) hours at the rate of time and one-half. It is the discretion of the Chief of Fire to determine which shift to call out.

### Section 11.4    HOLIDAY MANNING PROCEDURES. The following
procedure will be adhered to in order to ensure minimum manning for targeted holiday shifts,

24

which include, but are not limited to, December 24th (2000 - 0800) December 25th (0800 - 2000), December 31st (2000 - 0800) and January 1st (0800 - 2000):

(a)     During this holiday manning procedure, all members will be eligible to work overtime, provided they have been on the working Overtime List.  It is understood that any individual who is ineligible to work overtime due to existing administrative policies (i.e., Sick Leave Protocols, Disciplinary Policies, etc.) will remain ineligible.

(b)     All overtime worked during these target shifts will be paid at time and one-half.

(c)     Acceptance of overtime during this procedure will be binding.

(d)     The normal overtime replacement protocols currently in place shall be utilized.

### Section 11.5   OVERTIME STAFFING PROCEDURES

(a)     The Deputy Chief of Operations shall determine the placement of Officers and Firefighters per unit of duty.  The Deputy Chief of Operations may enhance officer and platoon strength, during an emergency.  Replacement of employees, when overtime is required to maintain platoon strength, will be on a rank for rank basis unless otherwise noted below:

### Battalion Chiefs

(1)     One (1) Battalion Chief will be on duty at all times, regardless of platoon strength.

(2)     Battalion Chief overtime will be filled by using the Battalion Chief's Department-Wide Overtime Rotational List.

(3)     If no Battalion Chief from the Battalion Chiefs' Department-Wide Overtime Rotational List is available or fit to work overtime, a Captain from the Captains' Department-Wide Overtime Rotational List will be called.

(4)     If no Captain from the Captains Department-Wide Overtime Rotational List is available or fit to work overtime, a Battalion Chief will be ordered to work.

### Captains

(1)     Captain overtime will be filled by using the Captains' Department-Wide Overtime Rotational List.

(2)     If no Captain from the Captains' Department-Wide Overtime Rotational List is available or fit to work overtime, a Lieutenant from the Lieutenants' Overtime Rotational List will be called.

25

(3)     If no Lieutenant from the Lieutenants' Department-Wide Overtime Rotational List is available or fit to work overtime, a Captain will be ordered to work.

### Lieutenants

(1)     Lieutenant overtime will be filled by using the Lieutenants' Department-Wide Overtime Rotational List.

(2)     If no Lieutenant from the Lieutenant's Department- Wide Overtime Rotational List is available or fit to work overtime, a Firefighter from the Firefighters' Platoon Overtime Rotational List (per Firefighters' overtime procedures number (1) & (2)) will be called.

(3)     If no firefighter from the Firefighters' Platoon Overtime Rotational List is available or fit to work overtime, a Lieutenant will be ordered to work.

### Firefighters

(1)     Firefighter overtime, when required to maintain platoon strength, will be filled by using the Firefighters' Platoon Overtime Rotational List for the platoon that is on their second day off.

(2)     If no Firefighter on his/her regularly scheduled second day off is available or fit to work overtime, Firefighter overtime will be filled by using the Firefighters' Platoon Overtime Rotational List using the following sequence for calling:

a.  Firefighters' Platoon Overtime Rotational List for their first day off

b.  Firefighters' Platoon Overtime Rotational List for their third day off

c.  Firefighters' Platoon Overtime Rotational List for eligible members of the working shift

(3)     If vacancies still exist after following the above sequence, the first eligible firefighter from the Firefighters' Platoon Overtime Rotational List shall be ordered to work.

## HOURS FOR CALLING OVERTIME

Hours for overtime calling under normal circumstances will be as follows:

1800 – 2200 hours – for the on-coming unit (0800 – 2000) for known vacancies

0600 – 0800 hours – for the on-coming unit (0800 – 2000) for vacancies created due to members reporting off after 2100 hours of the previous tour

0800 – 1100 hours – for the night unit (2000 – 0800) overtime

1700 – 2000 hours – for the night unit (2000 – 0800) for vacancies created due to members reporting off after 1100 hours

The overtime caller will leave a brief voicemail message, if possible, to confirm that calls for overtime were made. The voicemail message will include the caller's name, date, time, and overtime unit being called for as well as that the caller has moved on to the next available person on the overtime list.

## ELIGIBILITY FOR OVERTIME

### (a)    Suppression Personnel

A member of Fire Suppression must work one (1) tour of duty in order to be called for overtime.

Sick Leave or Suspension will not be considered as having worked a tour of duty.

### (b)    Administrative Personnel

Administrative Personnel must work four (4) or five (5) consecutive working days, depending on their assigned work schedule. Sick Leave or Suspension will not be considered as having worked their administrative tour of duty.

### (c)    All Members

No member will be called for overtime while any suspension without pay is pending. Any employee that is not eligible to work overtime, but is called, is responsible for informing the overtime caller of his/her ineligibility.

No member will work more than forty-eight (48) hours straight in combination of regular, exchange, or overtime hours. However, the Deputy Chief of Operations may require a member to work more than forty-eight (48) hours straight during emergency or special conditions.

### Overtime Rotational Lists

The following is an outline of the composition of the Overtime Rotational Lists:

### Officers' Department-Wide Overtime Rotational Lists

(1)    A list will be established on a voluntary basis, according to rank and seniority and will be continuous from year to year.

(2)    Officers wishing to have their names placed on or removed from their particular rank's Department-Wide Overtime Rotational List must do so either between December 1st and December 15th to become effective the following year, or between June 1st and June 15th to become effective July 1st.

27

(3)    Newly promoted officers wishing to have their names placed on their particular rank's Department-Wide Overtime Rotational List may do so at any time.

(4)    Any officer whose name appears on their particular rank's Department-Wide Overtime Rotational List may submit written authorization to the Deputy Chief of Operations authorizing his/she spouse or other responsible persons to accept work assignments for him/her.  The officer will be held responsible just as if he/she was contacted.

### Firefighters' Platoon Overtime Rotational Lists

(1)    A list will be established on a voluntary basis according to seniority in rank and assigned platoon and will be continuous from year to year.

(2)    Firefighters wishing to have their names placed on or removed from the Firefighters' Platoon Overtime Rotational List must do so either between December 1st and December 15th to become effective the following year, or between June 1st and June 15th to become effective July 1st.

(3)    If a new member is hired, he/she may submit their name for the Firefighters' Platoon Overtime Rotational List at any time after serving their one (1) year of probation.

(4)    Firefighters in divisions other than Suppression shall be assigned to a platoon for the purposes of adding them to the Firefighters' Platoon Overtime Rotational List.

(5)    Any Firefighter whose name appears on the Firefighters' Platoon Overtime Rotational List may submit a written authorization to the Deputy Chief of Operations authorizing his/her spouse or other responsible persons to accept work assignments for him/her.  The Firefighter will be held responsible just as if he/she was contacted.

**Section 11.6   MINIMUM MANNING**.  No on-duty piece of apparatus will be manned at the start of the shift by less than one (1) Officer and three (3) Firefighters.  This level of manpower shall be maintained for the duration of the shift unless affected by (a) sickness or injury of personnel assigned to Suppression; (b) notification of death in the immediate family of personnel assigned to Suppression; (c) personnel assigned to Suppression being immediately relieved from duty for violation(s) of rules and regulations as set forth in the Fire Department Rules and Regulations; or (d) any occasion of a temporary nature, which has been a past practice in the Fire Department.

### Section 11.7   PROMOTION LIST.

(d)    The promotion test will be completed by May 15th and will be good for a period of two (2) years.  It will be posted on June 15th of each year and will remain in effect until June 15th of the second subsequent year unless the Union is notified by the Administration on or before June 1st of that year that for good cause the promotion list cannot be completed by June 15th, in which case it may continue for a maximum of an additional thirty (30) days.

28

(e)      Promotions will become effective the date an officer begins his/her terminal leave.

(f)      Any Firefighter hired after August 24, 1993, wishing to take the promotional test for Lieutenant must have a Senior Firefighter status prior to the date of the test.

**Section 11.8   TRANSFERS.** Annual transfers will commence January 1st however, discretionary transfers can be made at any time during the course of the year. Whenever practicable employees will not be required to return before the completion of the vacation period. In such case the employee's transfer shall be postponed until the employee returns to work although other transfers shall remain unaffected. The meaning and/or definition of a vacation period is as written in Article 6 of this written Agreement.

**Section 11.9   FRIDAY AFTER THANKSGIVING.** An employee who works on the Friday after Thanksgiving from 0800 - 0800 hours the following day will receive payment for the number of hours worked. Any member working under Article 11.4 will be excluded from this section.

**Section 11.10  MAINTENANCE OF APPARATUS.** The maintenance of apparatus will meet Department of Transportation's standards with all such work to be performed by shops certified by the Department of Transportation. Certification/Records of Inspections will be made available upon request to the Union as inspections occur.

**Section 11.11  CROSSING GUARD DUTY.** No Firefighter will be compelled to do school crossing guard duty.

**Section 11.12  EDUCATION.** Employees taking courses in fire science, fire or safety management may have the cost of tuition paid in advance when approved in advance in writing by the Fire Chief. The taking of any such courses shall be on a voluntary basis only. Employees shall reimburse the City through payroll deductions if the course requirements are not satisfactorily or fully completed. The administrative procedures regarding education/tuition reimbursement will be addressed in an SOP. It is understood that any changes to the above-referenced SOP must be mutually agreed upon.

**Section 11.13  SHIFT DIFFERENTIAL.**

(a)      Effective June 30, 2016, shift differential shall be eliminated.

### ARTICLE 12
### RULES AND REGULATIONS

**Section 12. 1  MANAGEMENT RIGHTS.** The employees' representative agrees that the Employer has complete authority over the policies and administration of the Fire Department which it exercises under the provisions of law and in fulfilling its responsibilities under this Agreement, including all statutory and inherent managerial rights, prerogative and functions. Any matter involving the management of department operations except as expressly modified or restricted by a specific provision of this Agreement remains within the exclusive province of the Employer. This provision is not intended to cover, however, a fixed and

established past practice of the parties that has been unequivocally accepted by both parties over a reasonable period of time but has not been reduced to writing in this Agreement. Should the Union object to any work rule or regulation as being in violation of this Agreement, it may resort to the Grievance Procedure outlined in this Agreement.

## ARTICLE 13
## ACTING OUT OF RANK

**Section 13.1**   Any employee designated by appropriate authority to act out of rank will be paid at Step 1 of the higher rank in which they are designated to serve, for all hours worked in the higher rank, unless Step 1 of that rank does not provide a higher effective pay rate than the employee's current base annual salary, in which case the employee will be paid at the next Step in the designated rank that provides a higher effective hourly pay rate. All personnel substituting in a higher rank will be entitled to payment at the higher rank for all hours worked.

## ARTICLE 14
## PENSION

**Section 14.1**

(1)    The provisions of the fire pension as currently set forth in the Code of the City of Wilmington, Chapter 39, Section 39-176 through 39-187 and Sections 39-241 through 39-256 and in the laws of Delaware are incorporated into this Agreement by reference. The City and the Union agree that any changes within the pension benefits shall be done in consultation and negotiations between the representatives of the Union and the City. Upon the conclusion of the negotiations both parties shall jointly seek the legislation necessary to enact the agreed upon changes. There will be no change in the provisions of the fire pension without the agreement of the Union.

(2)    The Union agrees that employees will contribute to the Fire Pension Fund six percent (6%) of each employee's salary as set forth in Wilmington City Code Chapter 39, Sections 39-183(b) and 39-251(e).

(3)    For Firefighters employed on or after July 1, 1990, the City may elect, during the term of this Agreement, to participate in the State Administered County and Municipal Police/Firefighter Pension Plan as set forth in Chapter 88, Title 11 Delaware Code.

## ARTICLE 15
## OUTSIDE EMPLOYMENT

**Section 15.1**   Members of the Fire Department must obtain permission from the Chief of Fire as a prerequisite to the undertaking of supplementary employment. Employees will not be eligible for such employment unless they have completed at least six (6) months of employment as Firefighters.

(a)    The request to hold outside employment must indicate the employer, location, telephone number, and hours of work.

30

(b)    Members of the Fire Department shall not engage in off-duty employment, which may impair their ability to perform their assigned Fire Department duties. Under no circumstances is any member to be allowed to work more than four (4) hours at a second job on any regular workday.

(c)    No member of the Fire Department shall in any way undertake supplementary employment while on duty or in uniform, unless authorized by the Chief of Fire. Under no circumstances shall any member on sick or injured leave undertake supplementary employment.

(d)    All members shall fill out the Annual Residency/Outside Employment Declaration Form.

## ARTICLE 16
## CLASSIFICATION AND SALARIES

**Section 16.1**    The following salary rates will be in effect in the Fire Department for the duration of this Agreement.

Salaries effective July 1, 2023 shall be as reflected on Appendix B. Salaries in Appendix B include a thirty-eight hundredths of percent (.38%) increase to reflect the designation of June 19th (Juneteenth) as a City holiday.

Salaries effective July 1, 2024 reflect a general increase of 2.5%.

**NOTE:**  For the purpose of calculating the movement between Steps in the ranks as shown in Appendix B, the step number within each rank corresponds to the years of service within the department, except for employees who remain in probationary status for more than one year. In such cases, the employee shall move from Step 1, Probationary Firefighter, to Step 1, Firefighter upon completion of their probation, and thereafter progress through the steps accordingly.

**Section 16.2**    All probationary Firefighters hired after September 16, 2002, will comply with all conditions of employment as stipulated at the time of hire or the Probationary firefighter will be discharged from employment, except in extenuating circumstances as determined by the Chief of Fire and Director of Human Resources.

Probationary period will be one (1) year and maybe extended for a maximum of one (1) additional year at the discretion of the Chief of Fire.

**Section 16.3**    At the approval of the Deputy Chief of the Division, employees will be compensated at straight time for attending required departmental training/education that is scheduled when the employee is not on duty, excluding sick leave and exchange days.  Other reasons will be considered on a case-by-case basis.  Compensation is limited to the actual hours of attendance at the training.

## ARTICLE 17
## HOURS OF WORK

### Section 17.1

(1)    Effective 7/1/20, all Fire Suppression members of the Fire Department shall work a three (3) platoon system and a shift as determined and established by the Chief of Fire.

Effective July 1, 2023, additional hours off ("Kelly Days") shall be scheduled to reduce the annual hours to 2448.  As an example, if the Chief of Fire were to implement a three platoon system with a Complete Tour of Duty of (24) hours on, followed by forty-eight (48) hours off, then each employee would be scheduled for an additional twenty-four (24) hours off as a Kelly Day every sixth (6th) shift.

The platoon system for fire suppression members described above and any shift schedule may be changed at the discretion of the Chief of Fire.  The Chief of Fire shall provide at least six (6) months' prior written notice before any platoon or shift change, to allow the parties to engage in effects bargaining.  Notwithstanding the forgoing, the City agrees to maintain the current platoon and shift structure during the term of this Agreement through June 30, 2025.

(2)    Forty (40) hours shall constitute a week's work for all members of the Fire Department assigned or detailed to the Fire Prevention Division (Fire Marshall's Office and Fire Prevention Unit), Office of the Chief of Fire, Office of the Deputy Chief of Operational Services, Training Unit, Internal Affairs Unit, Planning and Research Unit, and the Data and Statistics Unit.  Daily hours of work for members assigned or detailed to the above-mentioned offices and units shall be assigned by the Chief of Fire, or his representative as required to meet the operational requirements of such offices and/or units.

(3)    The salary schedule contained in this Agreement is to be the total compensation for the schedule of hours worked listed in Section 16.1 and 16.2.

**Section 17.2**    Overtime shall be compensated for on the basis of straight time for work in excess of a normal daily tour of duty in any one (1) day; overtime shall be compensated on the basis of forty (40) hour work week and will be paid on the following basis:  Time worked in excess of twenty-nine (29) minutes will be compensated on the basis of a full hour; time worked less than twenty-nine (29) minutes will not be compensated; all time worked in excess of one (1) hour will be paid on the basis of time actually worked.

**Section 17.3**    The City will use seniority for the purposes of making "paid detail" assignments available.  If special expertise is required for the detail, as determined by the Deputy Chief of the Division, the most senior qualified individual will be given the opportunity to work the detail.  For City-sponsored paid details, members shall be compensated at one and one-half times (1.5x) their hourly rate of pay for all hours worked.

### Section 17.4   STAND-BY PAY

32

Any employee who is regularly assigned stand-by duty by their department head shall receive the following compensation:

(1)    Employees assigned to the Fire Marshall's Office, shall be compensated at their hourly rate for two (2) hours for every twelve (12) hours of stand-by duty.

In addition, should the employee be called in to work outside of his/her assigned shift, then he/she will be compensated in accordance with Section 11.3 of the contract.

Assignment to the required stand-by duty will be on a rotating basis based on the seniority among those employees who normally perform the work.

## ARTICLE 18
## COMPANY OFFICER LEAVE AND SUBSTITUTION

**Section 18.1**    A suppression company officer is authorized to give any member of his or her company up to two (2) hours leave, so long as another qualified member will cover or holdover for this member. In the absence of the company officer, the request will be directed to the Battalion Chief.

**Section 18.2**    A Battalion Chief is authorized to give any member of the Fire Department up to four (4) hours leave, so long as another qualified member will cover or hold-over for this member. In the absence of the Battalion Chief, the request will be directed to the Deputy Chief in Charge of Operations.

**Section 18.3**    Members of the Fire Department shall be permitted to work as replacements for other members, providing that:

(1)    At least twenty-four (24) hours' notice is given to the commanding officer of the member for whom another member is substituting, and the officer approves the substitution.

(2)    That such substitution shall not require the payment of overtime compensation by the City under the provisions of the Fair Labor Standards Act of 1938, as amended.

(3)    Exchange of days/unit (s) will be completed within six (6) months, provided that any Firefighter who retires owing exchange days/unit(s) must pay those back to the City.

(4)    If, on the second part of the exchange, the member being replaced is on sick or off-duty injury, the member scheduled to work will still work but the member being replaced will not be charged a sick day/unit for the duration of the exchange period.

(5)    If either member is unable to work the agreed date due to sickness or off-duty injury, that member will not be permitted to exchange for a period of three (3) months from the day/unit they reported off and will be required to work a "day/unit owed"

33

which must be repaid within sixty (60) calendar days. The day/unit repaid will be at the member's choice from three (3) options proposed by the department.

(6)    Both members involved in an exchange must be qualified to perform the job functions required by the exchanged shifts.

## ARTICLE 19
## ORDINANCES AND STATUTES

**Section 19.1**    In the event any ordinances or statutes relating to the members of the Fire Department provide or set forth benefits or terms in excess of or more advantageous than the benefits or terms of this Agreement, the provisions of such ordinances or statutes shall prevail.  In the event this Agreement provides or sets forth benefits or terms in excess of or more advantageous than those provided or set forth in any such ordinance or statute, the provisions of this Agreement shall prevail.

## ARTICLE 20
## NON-DISCRIMINATION

**Section 20.1**    The employer will not interfere with or discriminate in respect to any term or condition of employment against any employee covered by this Agreement because of membership in, or legitimate activity as required in this Agreement on behalf of the members of this bargaining unit, nor will the employer encourage membership in another union.

**Section 20.2**    The Union recognizes its responsibility as the exclusive bargaining agent and agrees to represent all employees in the bargaining unit without discrimination, interference, restraint or coercion.

**Section 20.3**    The provisions of this Agreement shall be applied equally to all employees in the bargaining unit without discrimination as to age, sex, marital status, race, color, creed, national origin, disability, veterans' status, sexual orientation, gender identity, pregnancy/childbirth, religion, or political affiliations.  The Union shall share equally with the employer the responsibility for applying this provision of the Agreement.

## ARTICLE 21
## BULLETIN BOARDS

**Section 21.1**    The employer agrees to provide reasonable bulletin board space labeled with the Union's name where notices of official Union matters may be posted by the Union.  The Union agrees that obscene language or materials designed to embarrass members of the Fire Department will not be placed on the bulletin board.  At the same time, the Employer recognizes that the Union's unrestricted right to post notices regarding Union matters.

**Section 21.2**    Employer agrees to read all Union notices at roll call each day. However, the employer's failure to do so shall not be the subject of a grievance under this Agreement.

34

## ARTICLE 22
## APPLICATION OF RULES AND
## REGULATIONS OF THE FIRE DEPARTMENT

**Section 22.1**    Articles 4 through 12 of the Rules and Regulations of the Department are incorporated into this Agreement by reference and made a part thereof. All other Rules and Regulations of the Department, General Orders, Standard Operating Procedures, and other internal directives are not part of this Agreement and are subject to Article 12.1 of this Agreement. The parties agree, however, that the classification of offense for Rules and Regulations not incorporated into this Agreement shall remain unchanged during the term of this Agreement. In the event that the Rules and Regulations, General Orders, Standard Operating Procedures, or other internal directives conflict with this Agreement, then the provisions of this Agreement shall govern.

**Section 22.2**

(1)    In the event an appeal is taken by an accused member from a Trial Board decision concerning a charge of a violation of the Fire Department Rules and Regulations, the decision of the appeal panel is final and binding, except as modified in Subsection (2) herein.

(2)    If an appeal panel upholds that a member under charges is "guilty" and increases the guilty member's penalty to over six (6) months of suspension without pay or increases the guilty member's penalty to demotion, or increases the guilty member's penalty to dismissal from the Fire Department, then and only then may the guilty member appeal the judgment to arbitration. The appeal to arbitration shall be made pursuant to Article 4, Section 4.8, and shall be made within twelve (12) calendar days from notification of the appeal panel decision.

(3)    The City and the Fire Department shall not place any adverse material or disciplinary content into an employee's personnel file unless the employee is provided the opportunity to review and receive a copy of any such material and content.

## ARTICLE 23
## MAINTENANCE OF STANDARDS

**Section 23.1**    The City agrees that all conditions of employment relating to wages, salaries, hours, insurance, vacations, sick leave, grievance procedures and all other terms and conditions of employment shall be maintained at not less than the highest standards in effect at the time of the signing of this Agreement, and the same shall be improved wherever specific provisions for improvement are made elsewhere in this Agreement. The parties agree that this provision in no way precludes the City from making reasonable, non-arbitrary modifications and additions to the Department's Rules and Regulations, General Orders, and Standard Operating Procedures which are no longer incorporated by reference in this Agreement.

## ARTICLE 24
## NO STRIKE CLAUSE

**Section 24.1**    The Union agrees that there shall be no strike, picketing, sit-down, slow-down, willful absence from assigned duty or the abstinence in whole or in part from full, faithful, and proper performance of the duties of employment during the life of this Agreement. The City agrees that there shall be no lockout during the life of this Agreement.

**Section 24.2**    In the event the prohibited activities listed in Section 1 of this Article do occur, the Union's officials and agents shall promptly and publicly disavow such prohibited activity and order their members to return to work.  The Union will notify the employer within twenty-four (24) hours after the commencement of such prohibited activities listed in Section 1 what measures it has taken to comply with the provisions of this Article.

## ARTICLE 25
## SENIOR FIREFIGHTER

**Section 25.1**    Firefighters who have completed six (6) years of service shall progress to Senior Firefighter status, provided they satisfy and, in the case of current Senior Firefighters, continue to maintain the following "Senior Firefighter" criteria:

(a)    Currently listed as qualified to "Act-out-of-Rank" by department.

(b)    Qualified as a Fire Apparatus Driver/Operator in accordance with N.F.P.A. 1002 excluding Section 3-4 (Hydraulic Calculations).  No written test will be required.

(c)    N.F.P.A. Firefighter II or its equivalent as determined by Delaware State Fire School.

(d)    Fifteen (15) hours or equivalent of valid and job-related education courses completed every five (5) years, such as, but not limited to, courses offered by the National Fire Academy, N.F.P.A. Fire Command, or the Delaware State Fire School (above basic firemanship). This will not include EMT courses.  The City will provide ample opportunity for this to be met through on-the-job education.

Those employees, who have not been able to satisfy or thereafter maintain the above criteria, will by virtue of this Agreement automatically lose their "Senior Firefighter" status including any monies associated with the Senior Firefighter classification and will remain, or revert to, Firefighter, Step 5.

## ARTICLE 26
## ALCOHOL AND CONTROLLED SUBSTANCE POLICY

**Section 26.1    POLICY AND OBJECTIVE.**  The City of Wilmington and IAFF Local 1590 share a concern regarding the possible presence in the workplace of employees who may be impaired due to the abuse of alcohol and/or controlled substances.  Such abuse can endanger the abuser, other employees, and the public.  As a matter of public policy, the City of Wilmington and Local 1590 have an obligation to provide a drug-free work environment for its

employees. Impaired employees also tend to undermine productivity and effective working relations in the workplace. Alcohol and controlled substance abusers also tend to have higher rates of absenteeism. Finally, possession or use without a prescription or the distribution or delivery of a controlled substance is a criminal offense. The public expects government employees to respect and obey the law, and controlled substance criminal offenses, whether on-or-off duty, by their very nature, constitute a breach of the public trust.

Therefore, in an effort to maintain a safe, healthy, and productive workplace, while maintaining the public trust, the City of Wilmington and Local 1590 hereby adopt the following policy regarding alcohol and controlled substance abuse and drug testing.

**Section 26.2  RATIONALE**. All members of the Fire Department are expected to report to work assignments fit for duty and to perform their duties:

(a)    Free from the adverse effects of the use of legal and illegal drugs, including alcohol; and

(b)    In a manner which will not present a hazard to themselves, their fellow members, nor the general public.

The missions of the Wilmington Fire Department revolve around protecting and serving the public. Therefore, all members must maintain a state of alertness and an ability to act in a rational manner with clear thought processes which are unaffected by the use of any drugs and/or alcohol.

Public trust is an essential element to the effective performance of any fire department, and this concept is rooted in the public having confidence in the integrity of its Firefighters. This confidence will be severely damaged by Firefighters abusing drugs and/or alcohol in any manner.

**Section 26.3  RESPONSIBILITIES**

(a)    All members of the Wilmington Fire Department are responsible for their own physical and mental condition and must conduct themselves in a manner in which their work performance remains free from any adverse effects of drug and/or alcohol abuse.

(b)    It will be the responsibility of all members to familiarize themselves with all sections of this policy.

(c)    All members must adhere to strict confidentiality throughout the entire testing and reporting process. Results of tests, both positive and negative, will be shared only with those few individuals having authorization from the Fire Chief. Any breach of confidentiality is a serious matter, which may result in disciplinary action.

**Section 26.4  PROHIBITION OF ALCOHOL AND CONTROLLED SUBSTANCE ABUSE**. Employees covered by this Agreement are prohibited from using or consuming any amount of alcohol or controlled substance on the City property, and/or while

37

conducting City business and during working hours, including lunch and other breaks. This includes but is not limited to narcotics, depressants, stimulants, hallucinogens, cocaine, and marijuana. Such use or consumption constitutes a violation of this policy.

Any possession or sale of alcohol or a controlled substance while on duty or on City property is prohibited. Such possession or sale constitutes a violation of this policy.

Employees covered by this Agreement are prohibited from reporting to work under the influence or effects of alcohol or any controlled substance. A confirmed positive test result for drugs or alcohol violates this policy.

Employees covered by this Agreement are prohibited from violating any federal, state or local criminal law regarding controlled substances, whether on duty or off duty. Actual criminal conviction is not necessary to establish violation of this policy.

Violation of this policy shall result in disciplinary action up to and including dismissal.

**Note: Use of certain over-the-counter or physician-prescribed drugs can affect behavior and performance. Employees must advise their supervisor and the City Dispensary whenever they are taking such drugs. In the event the drug is physician-prescribed, it is the employee's responsibility to have their treating physician notify the City Physician that such drug use may impair job performance. The employee will be required to use sick time or take a personal leave of absence should the use of the above noted drugs render them unfit for the safe performance of their duties.**

**Section 26.5   DRUGS TO BE TESTED FOR.** During routine annual physical examinations, drug and alcohol screening will be done by urinalysis. Alcohol initial screening may also be performed by Breathalyzer and alcotest instrumentation. Confirmatory testing shall be as set forth in Section 26.6.

All tests will be done to detect the presence* of:

| Substance | Initial Screen | Confirmatory Test |
|---|---|---|
| 1.  Alcohol, ethyl | Any level | .04 (BAC |
| 2.  THC/Cannabinoid Metabolites | Any level | Any level |
| 3.  Cocaine Metabolites | Any level | Any level |
| 4.  Opiate Metabolites | Any level | Any level |
| 5.  Amphetamines/Methamphetamines | Any level | Any level |
| 6.  Barbiturates | Any level | Any level |
| 7.  Benzodiazepine | Any level | Any level |
| 8.  Methaqualone | Any level | Any level |
| 9.  Methadone | Any level | Any level |
| 10.  Phencyclidine (angel dust, PCP) | Any level | Any level |

38

\*The level of substance necessary for a positive result under this policy will be the lowest level accepted by the latest technological advances or limitations of laboratory analysis which establishes to a reasonable medical certainty that the tested for drug is present.

\*This list is not intended as an exhaustive inventory of every drug that the department will test for. The selection of drugs will be based upon known abuses in the community and the ability of each drug to affect the member's performance.

**Section 26.6   TESTING METHOD**. The initial drug screen test will be performed by the Enzyme Multiplied Immunoassay Technique (E.M.I.T.) through urinalysis. The use of alcohol will be initially tested by breathalyzer/alcotest instruments. Any "positive" initial screening will require a second independent confirmatory "positive" test with the integrity of the specimens maintained by an appropriate "chain of custody" process. Confirmatory testing of alcohol will be by drawing blood.

Additional test will also be required for urine specimens exhibiting abnormal PH levels or other chemical abnormalities indicating possible adulteration.

All confirmatory drug tests will be made by the Gas Chromatography/Mass Spectrometry techniques (CG/MS).

Examinees, whose specimens are confirmed "positive", will be provided with an opportunity to have an independent licensed laboratory of their choice, and at their expense, conduct an additional test of the original specimen or specimens. Any request for this third test will be made by the member in writing and reach the Fire Chief within ten (10) days of the initial suspension date. The testing facility shall take a sufficient volume of blood or urine to allow an independent confirmation and maintain the integrity of such specimen.

The purpose of this paragraph is to prevent unauthorized access, which could compromise the integrity of the collection process or the specimen. The specimen shall remain under the direct control of the collection site person from delivery to its being sealed in the mailer. The mailer shall be immediately mailed, maintained in secure storage, or remain until mailed under the personal control of the collection site person. Handling and transportation of urine specimens from one authorized individual or place to another shall always be accomplished through chain of custody procedures. Since specimens and documentation are sealed in shipping containers that would indicate any tampering during transit to the laboratory and couriers, express carriers and postal service personnel do not have access to the chain of custody forms, there is no requirement that such personnel document chain of custody for the shipping containers during transit. Nor is there a requirement that there be a chain of custody entry when a specimen which is sealed in such a shipping container is put into or is taken out of secure storage at the collection site prior to pick up by such personnel. This means that the chain of custody is not broken, and a test shall not be canceled, because couriers, express carriers, postal service personnel, or similar persons involved solely with the transportation of a specimen to a laboratory, have not documented their participation in the chain of custody documentation or because the chain of custody does not contain entries relating to putting the specimen into or removing it from secure temporary storage at the collection site. Every effort shall be made to minimize the number of persons handling specimens.

Procedure for collecting urinary specimens shall allow individual privacy unless there is a reason to believe that a particular individual may alter or substitute the specimen provided, as further described in this paragraph. The following circumstances are the exclusive ground constituting a reason to believe that the individual may alter or substitute the specimen:

(a)     The employee has presented a urine specimen that falls outside the normal temperature range (32°- 38° C/90°- 100° F), and

(1)     The employee declines to provide a measurement of oral body temperature; or

(2)     Oral body temperature varies by more than 1° C/1.8° F from the temperature of the specimen.

(b)     The last urine specimen provided by the employee (i.e., on a previous occasion) was determined by the laboratory to have a specific gravity of less than 1.003 and a creatinine concentration below .2g/L;

(c)     The collection site person observes conduct clearly and unequivocally indicating an attempt to substitute or adulterate the sample (e.g., substitute urine in plain view, blue dye in specimen present, etc.); or

(d)     The employee has previously been determined to have used a controlled substance without medical authorization.

A higher-level supervisor of the collection site person, or a designated employer representative, or a designated employer representative, shall review and concur in advance with any decision by a collection site person to obtain a specimen under direct observation of a same gender collection site person based upon the circumstances described in this paragraph.

## Section 26.7   REPORTING AND REVIEW OF RESULTS.

(a)     Medical Review Officer (MRO) Shall Review Confirmed Positive Results.

An essential part of the drug-testing program is the final review of confirmed positive results from the laboratory. A positive test result does not automatically identify an employee as having used drugs in violation of this policy. An individual with a detailed knowledge of possible alternate medical explanations is essential to the review of results. This review shall be performed by the MRO prior to the transmission of the results to the Fire Department administrative officials. The MRO review shall include review of the chain of custody to ensure that it is complete and sufficient on its face. The duties of the MRO with respect to negative results are purely administrative.

(b)     Medical Review Officer -- Qualifications and Responsibilities.

The MRO shall be a licensed physician with knowledge of substance abuse disorders and may be an employee of the City or a private physician retained for this purpose.

40

The MRO shall not be an employee of the laboratory conducting the drug test unless the laboratory establishes a clear separation of functions to prevent any appearance of conflict of interest, including assuring that the MRO has no responsibility for, and is not supervised by or the supervisor of, any persons who have responsibility for the drug testing or quality control operations of the laboratory.

The role of the MRO is to review and interpret confirmed positive test results obtained through the employer's testing program. In carrying out this responsibility, the MRO shall examine alternate medical explanations for any positive test result. This action may include conducting a medical interview and review of the individual's medical history, or review of any other biomedical factors. The MRO shall review all medical records made available by the tested individual when a confirmed positive test could have resulted from legally prescribed medication. The MRO shall not, however, consider the results of urine samples that are not obtained or processed in accordance with this part.

(c)    Positive Test Results.

Prior to making a final decision to verify a positive test result for an individual, the MRO shall give the individual an opportunity to discuss the test results with him or her. The MRO shall contact the individual directly, on a confidential basis, to determine whether the employee wishes to discuss the test results. A staff person under the MRO's supervision may make the initial contact, and medically licensed or certified staff person may gather information from the employee. Except as provided in this section, the MRO shall talk directly with the employee before verifying a test as positive.

If, after making all reasonable efforts and documenting them, the MRO is unable to reach the individual directly, the MRO shall contact a designated management official who shall direct the individual to contact the MRO as soon as possible. If it becomes necessary to reach the individual through the designated management official, the designated management official shall employ procedures that ensure, to the maximum extent practicable, the requirement that the employee contact the MRO is held in confidence. If after making all reasonable efforts, the designated management official is unable to contact the employee, the employer may place the employee on temporary medically unqualified status or medical leave. The MRO may verify a test as positive without having communicated directly with the employee about the test in two circumstances:

(1)    The employee expressly declines the opportunity to discuss the test; or

(2)    The designated employer representative has successfully made and documented a contact with the employee and instructed the employee to contact the MRO and more than five (5) days have passed since the date the employee was successfully contacted by the designated employer representative.

Following verification of a positive test result, the MRO shall refer the case to the management official empowered to recommend or take action.

(d)    Disclosure of Information.

41

Except as provided in this paragraph, the MRO shall not disclose to any third-party medical information provided by the individual to the MRO as a part of the verification process. The MRO may disclose such information to the employer or physician responsible for determining the medical qualification of the employee only if in the MRO's reasonable medical judgment, the information indicates that continued performance by the employee of his or her safety-sensitive function could pose a significant safety risk.

**Section 26.8   REASONABLE SUSPICION TESTING.**  The department may also initiate drug and/or alcohol screening for any incident in which there is "reasonable suspicion" that the employee is under the influence of, or impaired to any degree, by drugs and/or alcohol while on duty.

When a member is arrested off duty for an alleged criminal act involving the possession of or use of a controlled substance, the employee may be ordered to report to the department for drug testing.  They shall be permitted to consult with a Union official.

"Reasonable Suspicion" means— "an articulable belief based on specific facts and reasonable inferences drawn from those facts that a member is under the influence of, or impaired to any degree, by drugs and/or alcohol."

Circumstances which constitute a basis for determining "reasonable suspicion" may include, but are not limited to:

(1)    Direct observation of drug and/or alcohol use.

(2)    The member's body shows evidence of drug use (e.g., "track marks," etc.)

(3)    The member is found to be in possession of alcohol and/or drugs while on duty.

(4)    Spontaneous unusual, abnormal, erratic, or unacceptable behavior.

(5)    A documented pattern of unusual, abnormal, erratic, or unacceptable behavior.

(6)    An unusual pattern of sick leave usage.

(7)    A serious on duty injury.  Serious shall mean any injury that requires the filing of a Department Injury Report.

(8)    An accident on duty, including motor vehicle accidents, which results in any property damage or bodily injury to any person.

(9)    Reporting to work unfit for duty.

42

(10)    The presence of physical symptoms of drug and/or alcohol use (i.e., glassy or bloodshot eyes, the odor of alcohol on breath, slurred speech, poor coordination, and/or reflexes, etc.)

A credible report of alcohol or drug abuse from a member or non-member may result in an investigation, which shall first consist of an interview with the member under suspicion. The interview shall be conducted by a superior officer and an Employee Assistance Program ("EAP") officer. If the interview establishes reasonable suspicion, a test may be ordered. If the interview does not establish reasonable suspicion, no test shall be ordered unless the department can independently establish "reasonable suspicion" by other means, such as those listed in subparagraphs 1 through 10 above. In no event shall an anonymous report of alcohol or drug abuse result in a test unless the department is able to independently establish reasonable suspicion through an investigation as set forth above.

All departmental supervisors initiating disciplinary action on the basis of "reasonable suspicion" will be required to detail in writing the specific facts, symptoms, or observations which formed the basis for their determination that "reasonable suspicion" existed to warrant the testing of the member.

A refusal of an employee to submit an adequate sample will be found in violation of this policy. The employee will be suspended without pay and subject to discipline up to and including discharge.

**Section 26.9   SUBSTANCE ABUSE INDICATORS/TRAITS**. All Fire Department supervisors and Firefighters are required to be alert for impaired job performance or behavior that exhibits traits consistent with drug and/or alcohol abuse.

The following behaviors are consistent with a chemically dependent employee. In most cases, these traits will be accompanied by clear evidence of deteriorating job performance.

In the absence of any deterioration of job performance or a specific incident giving rise to "reasonable suspicion," all department supervisors and Firefighters must be able to document enough indicators/traits to meet "reasonable suspicion" requirement before any testing can take place.

All department supervisors and Firefighters must be thoroughly familiar with the EAP and maintain a proactive role in the early detection of possible substance abuse problems:

(1) **Physical**
Loss of weight;
Increase thirst;
Chronic hoarseness of voice;
Chronic persistent running nose;
Tremors/twitching of mouth and/or nose;
Habitual grinding of teeth/licking of lips; and
excessive sweating/rise in body temperature.

43

(2) **Psychological**
Short temper;
Severe mood changes;
Desire for isolation;
Habitual irritability;
Questionable judgment;
Thinking becomes altered;
Shortened attention span;
Paranoid/argumentative/sensitive;
Difficulty remembering/memory lapses;
Regular periods of severe depression; and
overreaction to real or imagined criticism.

(3) **Behavioral**
Picking at food;
Sloppy appearance;
Persistent lateness;
Frequent absenteeism;
Needless risk taking;
Irrational decisions;
Frantic/rapid speech;
Delays in starting work;
Habitually short of cash;
Constant financial difficulties;
Compulsive, repetitive behavior;
Frequent visits to the bathroom;
Schedules/appointments not kept; and
alternate periods of high/low energy levels.

**Section 26.10 ROUTINE ANNUAL TESTING.** The department will initiate routine drug/alcohol screening of members during routine annual physical examinations.

**Section 26.11 RANDOM TESTING.** The City Personnel Department will appoint an individual in the Personnel Department to run a computer program, which selects the individuals who will be tested each month. The "pool" will be comprised of all Firefighters and officers up to and including the Chief; approximately 20 of those individuals will be subjected to random testing each month as selected by the computer program. Individuals selected for testing will be advised to report to the testing facility designated by the Employer for collection of samples. Samples will not be collected at fire stations.

Each employee to whom random testing is applicable shall be required to submit to a random screen performed under the auspices and/or guidance of the City of Wilmington. Any employee who refuses to submit an adequate sample will be found in violation of this policy and the employee will be immediately suspended without pay and be subject to additional disciplinary action up to and including discharge.

**Section 26.12 ENFORCEMENT**. A positive confirmatory test result will be considered a violation of this policy. An employee whose confirmatory drug test or alcohol test reveals a positive result is entitled to a pre-disciplinary hearing before any disciplinary action is taken by the City. The disciplinary procedures as set forth in the contract will be utilized for this purpose. Blood alcohol concentration of eight-one hundredths of one percent (.08%) or greater will result in punishment of a Class A level. Blood alcohol concentration of less than .08% will result in punishment at a level of Class B or lower. A blood alcohol concentration of less than .04%, although not a violation of this policy, may subject the Firefighter to a Class F offense. If a Firefighter has two Class F offenses for having a blood alcohol concentration level of less than .04% in any one-year period, they shall be required to report to the EAP for counseling and evaluation.

Upon request, a Firefighter shall be given a portion of the sample tested for private analysis at the employee's expense. An employee may not justify refusal to submit to a test, as some or all, as determined by the individual employee's health care plan.

The policy of use of the program is as follows:

(1)    The EAP services are available to all members of the bargaining unit and their immediate families.

(2)    When an employee's job performance deteriorates and is not corrected by normal supervisory attention, supervisors are encouraged to refer employees to seek the services of the EAP. The decision to accept referral for diagnosis and/or comply with the recommended treatment plan is solely the responsibility of the employee. Refusal to utilize the services of the EAP is not cause for disciplinary action. If substandard job performance persists, the employee is subject to normal disciplinary procedures.

(3)    Information will not be given to the employee's supervisor or other inquiring persons unless requested by the employee. All records and discussions between the EAP counselors and clients are maintained in a totally confidential manner.

(4)    Voluntary participation in the EAP will not jeopardize an employee's job security, promotional opportunities, or reputation.

(5)    Information about the EAP is provided to all new employees during the New Hire Orientation. Training for supervisors in how and when to make referrals to the EAP is provided through the annual supervisors' training course.

(6)    Expenses for initial and one time in-patient treatment visit (at an accredited drug abuse facility approved by the City), not covered under the employee's insurance plan, will be paid by the City of Wilmington. The City will pay for each employee for only two in-patient visits per lifetime. The City will not pay any amount not covered by the employee's health insurance plan in situations where subsequent in-patient care is required.

(7)    The employee may use accrued vacation or sick time while in treatment. Should such time not be available, other arrangements may be made under the Union contract or departmental approval. Employees, who have undergone initial in-patient treatment

program and who upon completion require out-patient care not covered by insurance, will be reimbursed for the total cost upon successful completion of such care.

(8)     The EAP services are integrated with other benefits and human resource activities including health benefits, wellness programs, and training programs.

(9)     Nothing in this policy nor in the implementation or operation of the Employee Assistance Program is to be interpreted as special regulations, privileges, or exceptions from standard administration practices applicable to job performance standards, nor replace normal disciplinary action should unsatisfactory job performance continue.

**Section 26.13 AFTER CARE TREATMENTS.**  The City will implement an After Care Treatment Program for those employees who are offered rehabilitation.  Such employees must sign a Last Chance Notification as a condition of continued employment under which the employee will be subject to "on demand" testing for a period of one year after completion of in-patient/out-patient treatment.

## ARTICLE 27
## PHYSICAL FITNESS PROGRAM

**Section 27.1**   The City will maintain a Physical Fitness program for each Firefighter to obtain a level of fitness consistent with the duties they may be called to perform.

## ARTICLE 28
## GENERAL SAVINGS CLAUSE

**Section 28.1**   If any proposal submitted by the Union, if granted, may not be put into effect because of applicable legislation, Executive Orders or Regulations dealing with Wage and Price Stabilization, then such proposals, or any part thereof, including any retroactive requirement approved by the Pay Board shall become effective at such time, in such amounts, and for such periods as will be permitted by law at any time during the life of this Agreement.

## ARTICLE 29
## ALTERATION OF AGREEMENT

**Section 29.1**   No agreement, alteration, understanding, variation, waiver, or modification of any of the terms or conditions or covenants contained herein shall be made by any employee or group of employees with the Employer and in no case shall it be binding upon the parties hereto unless agreement is made and executed in writing between the parties hereto and same has been ratified by the Union.

**Section 29.2**   The waiver of any breach or condition of this Agreement by either party shall not constitute a precedent in the future enforcement of the terms and conditions herein.

**Section 29.3**   It is understood and agreed that if any part of this Agreement is in conflict with mandatory Federal or State Laws, or mandatory provisions of the City Charter

approved by the voters, that such part shall be suspended and the appropriate mandatory provisions shall prevail, and the remainder of this Agreement shall not be affected thereby.

**Section 29.4**    During the negotiations resulting in this Agreement, the City and the Union each had the unlimited right and opportunity to make demands and proposals with respect to any subject matter as to which 19 *Del. C.* 16 imposes an obligation to bargain.  This Agreement contains the entire understanding, undertaking, and agreement of the City and the Union.  This provision shall not be construed as a waiver of the Union's right to bargain over wages, salaries, or other terms or conditions of employment, which are not statutory and inherent managerial rights, prerogatives, and functions.

### ARTICLE 30
### NO LAY-OFFS

**Section 30.1**    The City will not exercise its managerial right to lay-off employees during Fiscal Year 2012, ending on June 30, 2012.

### ARTICLE 31
### DURATION OF AGREEMENT

**Section 31.1**    This Agreement shall be effective as of July 1, 2023, and shall remain in full force and effect until June 30, 2025.

**Section 31.2**    If either party gives notice-requesting changes to this Agreement, the parties will endeavor to promptly begin negotiations.

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals this ____ day of June ____ A.D. 2023, this contract executed in duplicated originals.

CITY OF WILMINGTON                                 INTERNATIONAL    ASSOCIATION    OF
                                                   FIREFIGHTERS, LOCAL 1590

_____                    _____
Mayor

ATTEST: _____                    _____

                                                   _____

                                                   _____

APPROVED AS TO FORM:

_____                    _____

_____                    _____

47

**APPENDIX A**
**CITY OF WILMINGTON FY'24**
**Active Medical and RX Plan Rates-Effective 07/01/2023**
**HIGHMARK BCBS DE MEDICAL AND EXPRESS SCRIPTS RX PLAN SUMMARY**

| Service | **EPO Plan** In Network | | **PPO II Plan** In Network | Out-of-Network | **PPO I Plan** In Network | Out-of-Network |
|---|---|---|---|---|---|---|
| **Deductibles** | | | | | | |
| Employee Only | $ 500** | | None | $300** | None | $300** |
| Employee + One | $1,000** | | | $600** | | $600** |
| Employee + Family | $1,500** | | | $900** | | $900** |
| **Co-insurance Limits** | | | | | | |
| Employee Only | None | | $500* | $1,500** | None | $1,500** |
| Employee +One | | | $1,000* | $3,000** | | $3,000** |
| Family | | | $1,500* | $4,500** | | $4,500** |
| **Lifetime maximums** | Unlimited | | | | | |
| **Preventive** | | | | | | |
| Annual Exams | 100% | | 100% | Not covered | 100% | Not covered |
| Annual GYN Exam | 100% | | 100% | Not covered | 100% | Not covered |
| Mammogram | 100% | | 100% | 70%* | 100% | 80%* |
| Colonoscopy | 100% | | 100% | 70%* | 100% | 80%* |
| Pap Smear | 100% | | 100% | 70%* | 100% | 80%* |
| Well-child Care | 100% | | 100% | Not covered | 100% | Not covered |
| Immunizations | 100% | | 100% | 70%* | 100% | 80%* |
| Vision Exams | Not Covered | | Not Covered | Not covered | Not Covered | Not covered |
| Hearing Exams | 100% (PCP office) | | 100% (PCP office) | Not Covered | 100% (PCP office) | Not Covered |
| Prostate Screening | 100% | | 100% | 70%* | 100% | 80%* |
| **Illness or Injury** | | | | | | |
| Primary Doctor | $30 co-pay | | $10 co-pay | 70%* | $5 co-pay | 80%* |
| Specialist/Referral | $30 co-pay | | $20 co-pay | 70%* | $10 co-pay | 80%* |
| Laboratory Services | 100%* | | 100% | 70%* | 100% | 80%* |
| Imaging | 100%* | | 90% | 70%* | 100% | 80%* |
| Chiropractic | 100%* | | 90% | 70%* | 100% | 80%* |
| **In The Hospital** | | | | | | |
| Room and Board | 100%* | | 90% | 70%* | 100% | 80%* |
| Physician & Surgeon | 100%* | | 90% | 70%* | 100% | 80%* |
| Other Services | 100%* | | 90% | 70%* | 100% | 80%* |
| **Surgery – Outpatient** | 100%* | | 90% | 70%* | 100% | 80%* |
| **Maternity** | 100%* | | 90% | 70%* | 100% | 80%* |
| **Emergency** | | | | | | |
| Physician's Office | $30 co-pay | | $10 co-pay | 70%* | $5 co-pay | 80%* |
| Medical Aid Units | $30 co-pay | | $22 co-pay | 70%* | $10 co-pay | 80%* |
| Hospital ER | $150 co-pay (waived if admitted) | | $150 co-pay (waived if admitted) | $150 co-pay (waived if admitted) | $150 co-pay (waived if admitted) | $150 co-pay (waived if admitted) |
| **Mental Health & Substance Abuse** | | | | | | |
| **Inpatient** | | | | | | |
| Office Visits | 100%* | | 90% | 70%* | 100% | 80%* |
| | $30 co-pay | | $10 co-pay | 70%* | $5 co-pay | 80%* |
| **Prescription Drugs (Mandatory Generic)** Retail Mail Order | $10/$20/$35 for a 30-day supply $20/$40/$70 for a 90-day supply | | | | | |
| **Employee Weekly Cost (52)** | 12% | Wellness @ 10% | 12% | Wellness @ 10% | 12% | Wellness @ 10% |
| Employee Only | $39.66 HRA $250*** | $ 33.05 HRA $250*** | $ 47.29 HRA $250*** | $ 39.41 HRA $250*** | $61.89 | $51.58 |
| Employee + One | $ 72.93 HRA $500*** | $60.77 HRA $500*** | $86.56 HRA $500*** | $ 72.14 HRA $500*** | $112.65 | $93.88 |
| Employee + Family | $106.99 HRA $750*** | $ 89.16HRA $750*** | $127.03 HRA $750*** | $ 105.86 HRA $750*** | $165.37 | $137.81 |

* Percentage paid after deductible.
**Co-Insurance / Deductibles – Out-of-Network (PPO I and PPO II) ; Network Deductible (EPO)
***Includes HRA=Employer Paid Health Reimbursement Account

# APPENDIX A-1

## CITY OF WILMINGTON FY'24 ACTIVE EMPLOYEE
## METLIFE DENTAL PLAN SUMMARY

| Coverage Type | Dental Plan 1 | Dental Plan 2 | | Dental Plan 3 |
| --- | --- | --- | --- | --- |
| | | PDP In-Network | Out-of-Network | Buy-Up |
| **Type A**<br>• Cleanings, Oral exams, X-Rays<br>• Other maintenance type procedures<br>• Preventive Services | 75% | 100% of PDP Fee*<br>No Deductible | 100% of R&C Fee**<br>No Deductible | 100% |
| **Type B**<br>• Fillings<br>• Other standard dental procedures | 75% | 80% of PDP Fee* | 80% of R&C Fee** | 90% |
| **Type C**<br>• Bridges, Dentures, Implants<br>• TMJ & other complex procedures | 75% | 60% of PDP Fee* | 60% of R&C Fee** | 60% |
| **Type D**<br>• Orthodontia | 75% | 50% of PDP Fee* | 50% of R&C Fee** | 60% |
| **Deductible** (type B & C Services)<br>Individual<br>Family | None | $ 50<br>$150 | | None |
| **Annual Maximum Benefit** | $ 2,500<br>Per family | $ 1,500<br>Per individual | | $ 2,500<br>Per individual |
| **Orthodontia Lifetime Maximum**<br><br>Per Individual<br>(included in $2,500 annual FAMILY max) | $7,500 | $1,000 (to age 18)<br><br>Per Individual Dependent Child to age 18<br>(separate maximum) | | Adult & Children<br>$5,000 |
| **EMPLOYEE (26 bi-weekly deductions)**<br>**Employee Only**<br>**Employee + One**<br>**Family** | $ 1.00<br>$ 2.00<br>$ 3.00 | $ .50<br>$ 1.00<br>$ 1.50 | | $ 4.00<br>$ 6.00<br>$ 10.00 |
| *PDP Fee refers to the fees that participating PDP dentists have agreed to accept as payment in full, subject to any co-payments, deductibles, cost sharing and benefits maximums.<br>**R&C Fee refers to the Reasonable and Customary (R&C) charge which is based on the lowest of (1) the dentist's actual charge, (2) the dentist's usual charge for the same or similar services, or (3) the charge of most dentists in the same geographic area for the same or similar services as determined by MetLife. | | | | |

# APPENDIX A-2
# CITY OF WILMINGTON FY'24
# ACTIVE EMPLOYEE
# UNUM VISION PLAN SUMMARY

| Coverage Type | BASE PLAN (1 per 24 months) | | BUY- UP PLAN (1 per 12 months) | |
|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network |
| Exams | $0 co-pay | Up to $40 | $0 co-pay | Up to $40 |
| Retinal Imaging Benefit | $39 | Not Covered | $39 | Not Covered |
| **Standard Plastic Lenses** | | | | |
| Single Vision | $10 co-pay | Up to $30 | Covered | Up to $30 |
| Bifocal | $10 co-pay | Up to $50 | Covered | Up to $50 |
| Trifocal | $10 co-pay | Up to $70 | Covered | Up to $70 |
| Lenticular | $10 co-pay | Up to $70 | Covered | Up to $70 |
| Standard Progressive | $75 co-pay | Up to $50 | $65 co-pay | Up to $50 |
| Premium Progressive Lens | | | | |
| Tier 1 | $95 co-pay | Up to $50 | $85 co-pay | Up to $50 |
| Tier 2 | $105 co-pay | Up to $50 | $95 co-pay | Up to $50 |
| Tier 3 | $120 co-pay | Up to $50 | $110 co-pay | Up to $50 |
| Tier 4 | $75 co-pay, 80% of charge less $120 allowance | Up to $50 | $65 co-pay, 80% of charge less $120 allowance | Up to $50 |
| **Lens Options** Polycarbonate lenses (under age 19) | Covered | Up to $32 | Covered | Up to $32 |
| **Frames** Members may select any frame available | $100 allowance | Up to $70 | $200 allowance | Up to $140 |
| **Contact Lenses** In lieu of eyeglass lenses | $0 Co-pay | | $0 Co-pay | |
| Elective | $100 allowance | Up to $100 | $200 allowance | Up to $200 |
| Medically | Covered | Up to $210 | Covered | Up to $210 |
| Standard contact lens fitting exam fee | $40 | Not covered | $40 | Not Covered |
| **Employee - 26 Bi-weekly deductions** Employee only Employee + One Family | $0 $0 $0 | | $1.50 $3.00 $5.10 | |

# APPENDIX B

## FY24 SALARY TABLE
### Union 1590
### Effective 7/1/23

| Year | Step | PROBATIONARY FIREFIGHTER | Step | FIREFIGHTER | Step | SENIOR FIREFIGHTER | Step | LIEUTENANT | Step | CAPTAIN | Step | BATTALION CHIEF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | $ 48,439.88 | | | | | | | | | | |
| 2 | | | 1 | $ 53,940.94 | | | | | | | | |
| 3 | | | 2 | $ 59,317.54 | | | | | | | | |
| 4 | | | 3 | $ 64,694.14 | | | | | | | | |
| 5 | | | 4 | $ 70,070.74 | | | | | | | | |
| 6 | | | 5 | $ 75,452.27 | | | | | | | | |
| 7 | | | | | 1 | $ 77,518.77 | 1 | $ 85,437.12 | | | | |
| 8 | | | | | 2 | $ 77,518.77 | 2 | $ 85,437.12 | | | | |
| 9 | | | | | 3 | $ 77,518.77 | 3 | $ 85,437.12 | 1 | $ 93,755.60 | | |
| 10 | | | | | 4 | $ 79,181.12 | 4 | $ 89,188.20 | 2 | $ 93,755.60 | 1 | $111,695.70 |
| 11 | | | | | 5 | $ 79,181.12 | 5 | $ 89,188.20 | 3 | $ 93,755.60 | 2 | $111,695.70 |
| 12 | | | | | 6 | $ 81,269.87 | 6 | $ 90,971.97 | 4 | $ 98,124.68 | 3 | $113,880.23 |
| 13 | | | | | 7 | $ 81,269.87 | 7 | $ 90,971.97 | 5 | $ 98,124.68 | 4 | $113,880.23 |
| 14 | | | | | 8 | $ 82,895.27 | 8 | $ 92,791.41 | 6 | $100,087.18 | 5 | $116,064.77 |
| 15 | | | | | 9 | $ 82,895.27 | 9 | $ 92,791.41 | 7 | $100,087.18 | 6 | $116,064.77 |
| 16 | | | | | 10 | $ 84,553.17 | 10 | $ 94,647.23 | 8 | $102,088.92 | 7 | $118,386.06 |
| 17 | | | | | 11 | $ 84,553.17 | 11 | $ 94,647.23 | 9 | $102,088.92 | 8 | $118,386.06 |
| 18 | | | | | 12 | $ 86,244.23 | 12 | $ 96,540.18 | 10 | $104,130.70 | 9 | $120,753.78 |
| 19 | | | | | 13 | $ 86,244.23 | 13 | $ 96,540.18 | 11 | $104,130.70 | 10 | $120,753.78 |
| 20 | | | | | 14 | $ 87,969.12 | 14 | $ 98,470.98 | 12 | $106,213.31 | 11 | $123,168.86 |
| 21 | | | | | 15 | $ 87,969.12 | 15 | $ 98,470.98 | 13 | $106,213.31 | 12 | $123,168.86 |
| 22 | | | | | 16 | $ 89,728.50 | 16 | $100,440.40 | 14 | $108,337.58 | 13 | $125,632.24 |
| 23 | | | | | 17 | $ 89,728.50 | 17 | $100,440.40 | 15 | $108,337.58 | 14 | $125,632.24 |
| 24 | | | | | 18 | $ 91,523.07 | 18 | $102,449.21 | 16 | $110,504.33 | 15 | $128,144.88 |
| 25 | | | | | 19 | $ 91,523.07 | 19 | $102,449.21 | 17 | $110,504.33 | 16 | $128,144.88 |

## FY25 SALARY TABLE
### Union 1590
### Effective 7/1/24
### 2.5%

| Year | Step | PROBATIONARY FIREFIGHTER | Step | FIREFIGHTER | Step | SENIOR FIREFIGHTER | Step | LIEUTENANT | Step | CAPTAIN | Step | BATTALION CHIEF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | $ 49,650.88 | | | | | | | | | | |
| 2 | | | 1 | $ 55,289.46 | | | | | | | | |
| 3 | | | 2 | $ 60,800.48 | | | | | | | | |
| 4 | | | 3 | $ 66,311.49 | | | | | | | | |
| 5 | | | 4 | $ 71,822.51 | | | | | | | | |
| 6 | | | 5 | $ 77,338.57 | | | | | | | | |
| 7 | | | | | 1 | $ 79,456.74 | 1 | $ 87,573.05 | | | | |
| 8 | | | | | 2 | $ 79,456.74 | 2 | $ 87,573.05 | | | | |
| 9 | | | | | 3 | $ 79,456.74 | 3 | $ 87,573.05 | 1 | $ 96,099.49 | | |
| 10 | | | | | 4 | $ 81,160.65 | 4 | $ 91,417.91 | 2 | $ 96,099.49 | 1 | $114,488.09 |
| 11 | | | | | 5 | $ 81,160.65 | 5 | $ 91,417.91 | 3 | $ 96,099.49 | 2 | $114,488.09 |
| 12 | | | | | 6 | $ 83,301.62 | 6 | $ 93,246.27 | 4 | $100,577.80 | 3 | $116,727.24 |
| 13 | | | | | 7 | $ 83,301.61 | 7 | $ 93,246.26 | 5 | $100,577.80 | 4 | $116,727.24 |
| 14 | | | | | 8 | $ 84,967.65 | 8 | $ 95,111.20 | 6 | $102,589.36 | 5 | $118,966.39 |
| 15 | | | | | 9 | $ 84,967.65 | 9 | $ 95,111.19 | 7 | $102,589.35 | 6 | $118,966.39 |
| 16 | | | | | 10 | $ 86,667.00 | 10 | $ 97,013.41 | 8 | $104,641.14 | 7 | $121,345.71 |
| 17 | | | | | 11 | $ 86,667.00 | 11 | $ 97,013.41 | 9 | $104,641.14 | 8 | $121,345.72 |
| 18 | | | | | 12 | $ 88,400.34 | 12 | $ 98,953.68 | 10 | $106,733.97 | 9 | $123,772.62 |
| 19 | | | | | 13 | $ 88,400.34 | 13 | $ 98,953.68 | 11 | $106,733.96 | 10 | $123,772.63 |
| 20 | | | | | 14 | $ 90,168.35 | 14 | $100,932.75 | 12 | $108,868.64 | 11 | $126,248.08 |
| 21 | | | | | 15 | $ 90,168.35 | 15 | $100,932.76 | 13 | $108,868.64 | 12 | $126,248.08 |
| 22 | | | | | 16 | $ 91,971.71 | 16 | $102,951.41 | 14 | $111,046.02 | 13 | $128,773.05 |
| 23 | | | | | 17 | $ 91,971.71 | 17 | $102,951.41 | 15 | $111,046.02 | 14 | $128,773.04 |
| 24 | | | | | 18 | $ 93,811.15 | 18 | $105,010.44 | 16 | $113,266.94 | 15 | $131,348.50 |
| 25 | | | | | 19 | $ 93,811.15 | 19 | $105,010.44 | 17 | $113,266.94 | 16 | $131,348.50 |

# TABLE OF CONTENTS

PAGE

ARTICLE 1 PURPOSE ....................................................................................................................2

ARTICLE 2 EMPLOYEES REPRESENTATIVE, DEDUCTION OF FEES AND UNION
SECURITY ....................................................................................................................2

ARTICLE 3 DEFINITIONS.............................................................................................................3

ARTICLE 4 GRIEVANCE PROCEDURE.......................................................................................4

ARTICLE 5 HOLIDAYS .................................................................................................................8

ARTICLE 6 VACATION..................................................................................................................9

ARTICLE 7 SICK LEAVE ............................................................................................................13

ARTICLE 8 WORKER'S COMPENSATION ...............................................................................16

ARTICLE 9 AUTHORIZED LEAVE OF ABSENCE ...................................................................17

ARTICLE 10 HEALTH AND WELFARE.....................................................................................20

ARTICLE 11 WORKING CONDITIONS......................................................................................23

ARTICLE 12 RULES AND REGULATIONS ...............................................................................29

ARTICLE 13 ACTING OUT OF RANK........................................................................................30

ARTICLE 14 PENSION.................................................................................................................30

ARTICLE 15 OUTSIDE EMPLOYMENT....................................................................................30

ARTICLE 16 CLASSIFICATION AND SALARIES ....................................................................31

ARTICLE 17 HOURS OF WORK.................................................................................................32

ARTICLE 18 COMPANY OFFICER LEAVE AND SUBSTITUTION........................................33

ARTICLE 19 ORDINANCES AND STATUTES ..........................................................................34

ARTICLE 20 NON-DISCRIMINATION ......................................................................................34

ARTICLE 21 BULLETIN BOARDS.............................................................................................34

ARTICLE 22 APPLICATION OF RULES AND REGULATIONS OF THE FIRE
DEPARTMENT...........................................................................................................35

ARTICLE 23 MAINTENANCE OF STANDARDS ..................................................................35

ARTICLE 24 NO STRIKE CLAUSE ............................................................................................36

ARTICLE 25 SENIOR FIREFIGHTER...........................................................................................36

ARTICLE 26 ALCOHOL AND CONTROLLED SUBSTANCE POLICY ...............................36

ARTICLE 27  PHYSICAL FITNESS PROGRAM.......................................................................46

ARTICLE 28 GENERAL SAVINGS CLAUSE ............................................................................46

ARTICLE 29 ALTERATION OF AGREEMENT.........................................................................46

ARTICLE 30 NO LAY-OFFS.........................................................................................................47

ARTICLE 31 DURATION OF AGREEMENT .............................................................................47

APPENDIX A .................................................................................................................................48

APPENDIX A-1...............................................................................................................................49

APPENDIX A-2...............................................................................................................................50

APPENDIX B ..................................................................................................................................51

**EFiled:  Dec 18 2025 03:12PM EST**
**Transaction ID 78034817**
**Case No. N25C-12-278 FWW**

EFiled:  Dec 15 2025 12:14PM EST
Transaction ID 77998053
Case No. N25C-12-278 FWW

## IN THE SUPERIOR COURT
## OF THE STATE OF DELAWARE

DENNIS KIRLIN,          )
                     )
      Plaintiff,      )
                     )     C.A. No. _____
     v.               )
                     )     JURY TRIAL DEMANDED
                     )
                     )
CITY OF WILMINGTON    )
                     )
      Defendant.   )

### SUMMONS

THE STATE OF DELAWARE,
TO THE SHERIFF OF NEW CASTLE COUNTY:
YOU ARE COMMANDED:

      To summon the above named defendant so that, within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon Michele D. Allen, Esquire, Plaintiff's attorney, whose address is 4250 Lancaster Pike, Suite 230, Wilmington, Delaware 19805, an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense).

      To serve upon defendant a copy hereof and of the Complaint (and of the affidavit of demand if any has been filed by plaintiff).

DATED: 12-18-25

                                COLLEEN REDMOND
                                Prothonotary

                                Per Deputy

TO THE ABOVE NAMED DEFENDANT:

      In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorneys named above an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense),

judgment by default will be rendered against you for the relief demanded in the Complaint (or in the affidavit of demand, if any).

COLLEEN REDMOND
Prothonotary

Per Deputy

EFiled: Jan 28 2026 09:44AM EST
Transaction ID 78309627
Case No. N25C-12-278 FWW

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

DENNIS KIRLIN,          )
                                   )
               Plaintiff,      )
                                   )
        v.                )   C.A. No. N25C-12-278 FWW
                                   )
CITY OF WILMINGTON,   )
                                   )
           Defendant.   )
                                   )

## <u>ENTRY OF APPEARANCE</u>

**PLEASE ENTER THE APPEARANCE** of Lauren E.M. Russell of Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, Wilmington, Delaware 19801 as counsel for Defendant City of Wilmington.

POTTER ANDERSON & CORROON LLP

*/s/ Lauren E.M. Russell*
_____

Lauren E.M. Russell (No. 5366)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: 302.984.6003
Facsimile: 302.658.1192
Email: lrussell@potteranderson.com

*Counsel for Defendant City of Wilmington*

Dated: January 28, 2026



EFiled: Jan 29 2026 09:20AM EST
Transaction ID 78329875
Case No. N25C-12-278 FWW



**Sheriff's Office**

800 N. French Street, 5th Floor
Wilmington, Delaware 19801
302-395-8450, Fax: 302-395-8460

State of Delaware

New Castle Coun

**Scott T. Phillips**
Sheriff

1/23/2026

**Court Case # N25C-12-278 FWW**
Sheriff # 26-000657

Summons and Complaint

## DENNIS KIRLIN
### vs
## CITY OF WILMINGTON

     Steven Elliott, being duly sworn, deposes that he/she is a Deputy Sheriff and avers that he/she served CITY OF WILMINGTON by leaving upon DONNA KELLUM WILM LAW DEPT STAFF  at 800 N. FRENCH STREET 9TH FLOOR LAW DEPARTMENT WILMINGTON, DE 19801  on 1/22/2026 at 2:10 PM a copy of Summons and Complaint

Fees Paid:  $40.00

Per Deputy Sheriff, Steven Elliott

SO ANS;

          SHERIFF

Per   Janice Frisby-Dowe